WILLIAM E. SHEA & others[1] *vs.* BOSTON EDISON COMPANY
& others.[2]

Suffolk. March 6, 2000. - April 19, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Electricity. Taxation,* Excise. *Constitutional Law,* Taxation, Equal protection of
laws. *Electric Company. Municipal Corporations,* Municipal electric plant.

Discussion of St. 1997, c. 164, which restructured the electric utility industry,
and G. L. c. 164, under which the Department of Telecommunications and
Energy regulates electric companies. [253-255]

Discussion of G. L. c. 25, §§ 19 and 20, as appearing in St. 1997, c. 164,
§ 37, which impose charges on customers of investor-owned for-profit
electric utilities that transmit or distribute but do not generate electricity.
[255-258]

The charges imposed on consumers of electricity by operation of G. L. c. 25,
§§ 19 and 20, were more like excise taxes than regulatory fees, as those
were described in *Emerson College* v. *Boston*, 391 Mass. 415, 424-425
(1984), where the charges funded activities and programs that benefited the
general public, where the payment of the charges was not truly voluntary,
and where revenue from the charges was not used to meet expenses.
[258-260]

The charges (excise taxes) imposed on consumers of electricity by G. L. c. 25,
§§ 19 and 20, were not "unreasonable" so as to be unconstitutional,
where the benefits and burdens of the charges were not disproportional and
where the differences between investor-owned utilities and municipal light-
ing plants justified different tax treatment of their respective customers.
[260-263]

The classifications set forth in G. L. c. 25, §§ 19 and 20, had a fair and
rational relation to legitimate State interests in promoting energy efficiency,
renewable energy projects, and concomitant environmental and economic
benefits associated with those goals, and were not unconstitutional.
[263-264]

---

[1]Maxine Stanesa, Rosemary S. McPhee, Barbara Kane, Victor LeBlanc,
Susan J. Smith, Mary Ellen Hurley, and Springfield Muffler Inc.

[2]Cambridge Electric Light Company, Commonwealth Electric Company,
Western Massachusetts Electric Company, Fitchburg Gas and Electric Light
Company, Massachusetts Electric Company, Nantucket Electric Company,
Eastern Edison Company, the Department of Telecommunications and Energy,
the Division of Energy Resources, the Massachusetts Technology Park
Corporation, and the Municipal Electric Association of Massachusetts, Inc.,
whose motion to intervene as a defendant was allowed by a single justice of
this court.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 2, 1998.

The case was reported by *Lynch, J.*

*Walter H. McLaughlin, Jr. (David L. Klebanoff* with him) for the plaintiffs.

*Daniel J. Hammond,* Assistant Attorney General, for Department of Telecommunications and Energy & another.

*Carl Valvo* for Massachusetts Technology Park Corporation.

*William S. Stowe,* for Boston Edison Company & others, was present but did not argue.

*Robert P. Rodophele, Gerald J. Caruso, & Carlene A. Pennell,* for Municipal Electric Association of Massachusetts, Inc., were present but did not argue.

*Harold Hestnes, Daniel W. Halston, Colleen E. Dunham, Doron Ezickson, & Paige Graening,* for Massachusetts Electric Company & others, submitted a brief.

*Carol Lee Rawn,* for Conservation Law Foundation, amicus curiae, submitted a brief.

GREANEY, J. The plaintiffs, eight customers of electric companies that are privately investor-owned utilities (IOUs), which operate for-profit, brought this action in the Supreme Judicial Court for Suffolk County seeking a declaratory judgment and other relief against the defendants, the eight electric companies that provide them with their electricity, and against the Department of Telecommunications and Energy (department), the Division of Energy Resources (division), and the Massachusetts Technology Park Corporation (corporation). The Municipal Electric Association of Massachusetts, Inc. (association), a Statewide organization of forty municipal lighting plants (MLPs), intervened in the case as a defendant. The plaintiffs asserted, principally, that two provisions of St. 1997, c. 164, "An Act relative to restructuring the electric utility industry in the Commonwealth, regulating the provision of electricity and other services, and promoting enhanced consumer protections therein" (Act), G. L. c. 25, §§ 19 and 20, as appearing in St. 1997, c. 164, § 37, violate Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution, by imposing unreasonable excise taxes, and the equal protection clause of the Fourteenth Amendment to the United States Constitution, by requiring customers of IOUs to pay charges that are not required of customers of MLPs. The Attorney General was notified pursuant to G. L. c. 231A, § 8A,

and given an opportunity to be heard. The parties filed a statement of agreed facts and exhibits, and they deferred decision of other issues in the case pending resolution of the constitutional issues just described. A single justice of this court reserved and reported the case without decision to the full court. We conclude that the challenged provisions of the Act are constitutional, and we remand the case to the county court for the entry of an appropriate judgment.

The background facts may be summarized as follows. In Massachusetts, customers obtain electricity at the retail level from either IOUs or MLPs,[3] usually depending on where the customer lives, with limited exceptions that are not relevant here. The eight defendant IOUs serve approximately 300 municipalities. In 1997, IOU customers consumed approximately eighty-six per cent of the electricity sold at retail, as opposed to the thirteen per cent of electricity sold to, and consumed by, MLP customers.

Historically, IOUs have engaged in all three components of the electric utility industry, that is, generation, transmission, and distribution. IOUs performing all of these components have also been called vertically integrated utilities. MLPs have engaged in generation and distribution. Generation involves the transforming of electricity from other energy forms, such as fissile material (nuclear), fossil fuel (such as oil, natural gas, or coal), or renewable resources (such as water, wind, solar energy, or wood). IOUs and MLPs have also supplied electricity to customers by selling them electricity purchased elsewhere, inside or outside of Massachusetts, at wholesale.[4] Transmission involves the delivery of electrical power from generating facilities over interconnected high voltage lines (also known as the grid) to local distribution networks. Distribution refers to the delivery of electricity to the customer, or end user, from the transmission system or the generating plant.

The department has extensively regulated IOUs. G. L. c. 164,

---

[3]A municipal lighting plant (MLP) is, for our purposes, an electric plant owned by the municipality which created it. G. L. c. 164, §§ 34-36. MLPs are created by special legislation or under the procedures set forth in G. L. c. 164, §§ 34-43. While in certain circumstances a MLP may provide electricity to adjoining municipalities, see G. L. c. 164, § 47, its primary purpose is to provide electricity for "municipal use or for the use of its inhabitants." Id. at § 34.

[4]MLPs also have had the option of jointly acquiring electricity through membership in the Massachusetts Municipal Wholesale Electric Corporation.

§§ 76-102C. The department has had the authority, for example, to supervise IOUs, *id.* at § 76; to "make all necessary examination and inquiries and keep itself informed as to the condition of the respective properties" owned by IOUs, and "the manner in which they are conducted," *id.*; to promulgate rules and regulations as may be needed, *id.* at § 76C; and to ensure "compliance with the provisions of law and the orders, directions and requirements of the department," *id.* at § 76. The department's authority also includes the right to approve of, and regulate, rates charged by IOUs to customers, as well as the right to investigate the propriety of any proposed rate. *Id.* at § 94.

In contrast, the department's regulatory authority over MLPs has been minimal. G. L. c. 164, §§ 34-69A. Most MLPs are governed by a locally elected board of either three or five commissioners. *Id.* at § 55. Daily MLP operations are overseen by an appointed manager. *Id.* at § 56. Without department review or approval, MLPs have had the authority to acquire property, *id.* at § 42; to enter into contracts to purchase electricity, *id.* at §§ 51 and 52, or to purchase equipment, supplies, or materials, *id.* at § 56D; to incur debt, *id.* at § 40; and to raise capital, *id.* at § 57. In addition, local officials determine rates charged by MLPs. *Id.* at §§ 56 and 58. Rates are subject to a statutory limitation, that the return not exceed eight per cent of the plant's expenses, which the department has had authority to enforce. *Id.* at § 58. The bills, payrolls, and expenses of MLPs are subject to the approval of the municipality's auditor. *Id.* at § 56.

The Act's passage on November 25, 1997, ended the regulated monopolistic system that the IOUs have enjoyed for most of the Twentieth Century. See St. 1997, c. 164, § 1 (*d*). The primary component of the Act replaced the existing regulated ·monopolistic system with an open and competitive retail market for electricity for IOU customers, intended to result in "long-term rate reductions" for customers; to "encourage innovation, efficiency, and improved service from all market participants"; and to "enable reductions in the cost of regulatory oversight." See St. 1997, c. 164, § 1 (*c*), (*f*), (*k*), (*l*), (*w*); G. L. c. 164, §§ 1A (*a*), 1B (*b*). An IOU customer may choose its own generator, or supplier, see *id.* at § 1, of electricity, see *id.* at § 1A (*a*), and, thus, may also choose the source of its electricity, including nuclear power, coal, oil, natural gas, or

renewable resources. The latter source of energy, "renewable energy," is energy generated from resources "whose common characteristic is that they are nondepletable or are naturally replenishable but flow-limited," or are derived from "existing or emerging non-fossil fuel energy sources or technologies." *Id.* at § 1. In furtherance of the electric industry's restructuring, most IOUs have been, or will be, transformed into transmission and distribution companies, and, after a transition period (with certain exceptions not relevant here), will divest themselves of ownership of generating facilities, and will no longer engage in generating electricity. See *id.* at §§ 1 and 1A. See also *id.* at § 1B (*c*). We shall refer to these IOUs as distribution IOUs or IOU distribution companies. Each distribution IOU will retain "the exclusive obligation to provide distribution service to all retail customers within its service territory." *Id.* at § 1B (*a*). Distribution IOUs will remain extensively regulated by the department, which is charged with overseeing, implementing, and enforcing adherence to the restructuring process. See *id.* at §§ 1A, 1B, 1C, 1D, 1F, 1G, 1H.

The Act, St. 1997, c. 164, § 197, specifically exempts MLPs "from the requirements to allow competitive choice of generation supply" to their customers. G. L. c. 164, § 47A (*a*). However, the Act requires the governing body for all communities served by MLPs that have not already converted to the open market system by March 1, 2003, to conduct a study and hold public hearings, and the Act permits these communities to hold a referendum to determine whether to do so. *Id.* at § 47A (*f*). As of November 8, 1999, no MLP has opened its service territory to competitive retail suppliers.

The Act, St. 1997, c. 164, § 37, also contains two provisions, G. L. c. 25, § 19 (§ 19 charge), and G. L. c. 25, § 20 (§ 20 charges) (together, the charges), with which we are particularly concerned, that impose "mandatory" charges essentially on distribution IOU customers only.[5] The charges are based on the sale of a kilowatt hour of electricity by a distribution IOU to its

---

[5]The § 19 charge does not apply to MLP customers, see G. L. c. 25, § 19, and the § 20 charges do not apply to customers of MLPs that do not supply generation service outside of their respective service territories, or MLPs which do not open their service territories to competitive retail suppliers, see G. L. c. 25, § 20 (*a*) (1). Because we have not been informed that any MLP has supplied electricity outside of its service territory, or opened its service territory to competitive retail suppliers, we refer only to those customers affected by the charges, the customers of distribution IOUs.

retail customer multiplied by a rate established by statute. See
G. L. c. 25, §§ 19, 20. The amount of the § 19 charge varies
from year to year over a five-year period (between 1998 and
2002). The revenue generated from the charge is retained by
IOUs, and it must be used by them "to fund energy efficiency
activities, including, but not limited to, demand-side manage-
ment programs." *Id.* at § 19. "Energy efficiency" is defined as
"the implementation of an action, policy, or measure which
entails the application of the least amount of energy required to
produce a desired or given output." G. L. c. 164, § 1. Demand-
side management relates to "any technology, measure, or action
designed to decrease the kilowatt or kilowatthour use, or to
alter the time pattern of that use by consumers of electricity."
220 Code Mass. Regs. § 11.02 (1998). The division is charged
with overseeing and coordinating these energy efficiency
programs. G. L. c. 25A, § 11G. Commencing in March, 2003, a
charge of at least twenty per cent of the annual amount expended
by a distribution IOU for residential demand-side management
programs, and in no event less than $0.0025 per kilowatt hour,
"shall be spent on comprehensive low-income residential
demand-side management and education programs."[6] G. L. c.
25, § 19. We shall collectively refer to these charges as the
§ 19 energy efficiency charge.

Section 20 actually imposes two charges. See G. L. c. 25,
§ 20 (*a*) (1) and (2). The amount of the first charge varies year
to year over a five-year period (between 1998 and 2002) and,
commencing in 2003, constitutes $0.0005 per kilowatt hour. *Id.*
at § 20 (*a*) (1). The stated purpose of this charge is "to support
the development and promotion of renewable energy projects in
accordance with [G. L. c. 40J, § 4E]." *Id.* Under G. L. c. 40J,
§ 4E (*b*), funds from this charge may be used "for the public
purpose of generating the maximum economic and environmen-
tal benefits over time from renewable energy to the ratepayers
of the [C]ommonwealth through a series of initiatives which
exploits the advantages of renewable energy in a more competi-
tive energy marketplace by promoting the increased availability,

---

[6]The Act, St. 1997, c. 164, § 37, requires the division to examine the state
of energy efficiency markets, as well as environmental and economic goals, on
March 1, 2001, to determine whether energy efficiency programs should
continue. G. L. c. 25, § 19. If the division determines that "the continued
operation of the programs delivers cost-effective, energy efficiency services,"
it is required to file legislation with the General Court to continue "a charge
to fund energy efficiency activities." *Id.*

use, and affordability of renewable energy, by making operational improvements to existing renewable energy projects and facilities which . . . have achieved results which would indicate that future investment in said facilities would yield results in the development of renewable energy more significant if said funds were made available for the creation of new renewable energy facilities, and by fostering the formation, growth, expansion, and retention within the [C]ommonwealth of preeminent clusters of renewable energy and related enterprises, institutions, and projects, which serve the citizens of the [C]ommonwealth." We shall refer to this charge as the § 20 renewable energy charge.

The second § 20 charge imposes a charge of $0.00025 per kilowatt hour of electricity on the annual revenues derived from the annual § 20 renewable energy charge. G. L. c. 25, § 20 (*a*) (2). The revenue from this charge must be used to provide "grants to municipalities and other governmental bodies to provide debt service assistance" for one of two purposes: (1) to "alleviat[e] payment obligations incurred by said municipalities and other governmental bodies through an existing contractual agreement pursuant to the installation of pollution control technology and the implementation of other operational improvements to existing renewable energy projects and facilities in the commonwealth utilizing waste-to-energy technology as a component of municipal solid waste plant technology in commercial use," or (2) to facilitate "the closure of any such existing facilities." G. L. c. 40J, § 4E (*f*) (2).[7] See G. L. c. 40J, § 4E (*a*). We shall refer to this charge as the § 20 waste-to-energy charge.

The § 20 charges are collected by IOU distribution companies and remitted to the defendant corporation which deposits the charges into the Massachusetts Renewable Energy Trust Fund (trust fund). See G. L. c. 25, § 20 (*c*). The corporation is "constituted a public instrumentality of the [C]ommonwealth," G. L. c. 40J, § 3, which is not "subject to the supervision or control of [the] department or of any board, bureau, department or other agency of the [C]ommonwealth except as specifically provided [by law]." *Id.* The corporation is charged with

---

[7]Although municipal waste is a renewable fuel, an increase in its use is not mandated by G. L. c. 25A, § 11F (*b*), which provides that waste-to-energy shall only be considered a renewable energy generating source through December 31, 1998.

administering the trust fund consistent with the public purposes of the respective charges. *Id.* at § 4E. It segregates the amounts collected pursuant to the two § 20 charges. *Id.* at § 4E (*a*).

An additional component of the Act mandates a guaranteed ten per cent rate reduction, effective March 1, 1998, and a fifteen per cent inflation-adjusted reduction as of September 1, 1999, only to customers of IOU distribution companies. G. L. c. 164, § 1B (*b*). These rate reductions are provided, in part, through what is termed a "standard offer" under the Act. *Id.* The standard offer represents the relationship that, by default, will continue between a distribution IOU and its customers, unless and until the customer chooses a supplier from which to receive electricity. *Id.*

1. We first take up the plaintiffs' contention that the charges are excise taxes. While most of the defendants have agreed that, for the purposes of this lawsuit, the charges may be deemed excise taxes, the defendant intervener contends that the charges amount to regulatory fees.[8] As a preliminary matter, we must, therefore, ascertain the nature of the charges by determining their operation and effect. *Emerson College* v. *Boston*, 391 Mass. 415, 424-425 (1984).

As a general matter, a regulatory fee is "imposed by an agency upon those subject to its regulation. . . . It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive . . . [o]r it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." (Citations omitted.) *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.*, 421 Mass. 196, 201-202 (1995), quoting *San Juan Cellular Tel. Co.* v. *Public Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992). Regulatory fees "share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society,' . . . they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge . . . and the charges are collected not to raise revenues but to compensate the governmental entity providing

---

[8]Several of the IOU defendants are of the opinion that the charges are rates and not taxes, but state that they will not attempt to challenge the plaintiffs' characterization of the charges as excise taxes.

the services for its expenses" (citation and footnote omitted). *Emerson College* v. *Boston, supra* at 424-425, quoting *National Cable Television Ass'n* v. *United States*, 415 U.S. 336, 341 (1974).

The charges here are not fees because they fail each of the three tests enumerated in the *Emerson College* case. First, the charges support the funding of energy efficiency activities; the development and promotion of renewable energy projects; and either improvements to, or the closure of, waste-to-energy facilities. While the advantages from these activities and programs certainly benefit the customers of distribution IOUs, they also benefit the general public. In particular, with respect to the § 19 energy efficiency charge, the general public receives what the parties have termed as "spillover" benefits, such as energy saving devices. For example, both distribution IOU customers, and members of the general public who are not IOU customers, may equally enjoy cost savings from using compact fluorescent light bulbs, which have been promoted by energy efficiency programs and are available to all citizens.

With respect to the § 20 charges, the renewable energy charge and waste-to-energy charge, the department, in its December 30, 1996, Electric Industry Restructuring Plan, stated that effective use of alternative energy resources can, among other effects, "reduce the environmental impact of providing electric service . . . and further important Department, state, and national energy goals." The department recounted that commentators have noted "that the use of renewable resources also contributes the following benefits: improving national energy security by decreasing reliance on foreign fuels; improving public health by reducing the number of pollutants entering the environment; reducing health and life insurance costs as a result of the overall improvements to public health; reducing the release of fossil-fuel-related carbon dioxide . . . into the atmosphere, thus mitigating a factor that has been cited by many authorities as a threat to the future of the global ecosystem and agricultural enterprise [global warming]; and enabling energy producers to avoid the high costs associated with non-compliance fines, environmental cleanup, and taxes on emissions, by shifting production to sources that are less harmful to the environment." In addition, funds from the waste-to-energy charge will lessen adverse effects to the environment by either improving or eliminating waste-to-energy facilities. These effects certainly benefit all citizens of the Commonwealth.

Second, as electricity is a commodity "essential to the health and well-being of all residents of the [C]ommonwealth, to public safety, and to orderly and sustainable economic development," St. 1997, c. 164, § 1 (*a*), the payment of the charges by customers of distribution IOUs is not truly voluntary. The language of each section refers to each charge as a "mandatory charge." G. L. c. 25, §§ 19, 20 (*a*) (1). We also note that distribution IOU customers do not pay the charges in exchange for a specific, requested benefit or privilege.

Last, the revenue from the charges is not used to meet expenses incurred by the distribution IOUs in providing distribution services, but instead is either retained by the distribution IOUs, in the case of the § 19 charge, and expended in accordance with the department and the division approved projects advancing energy efficiency, or remitted to a public corporation, in the case of the § 20 charges, to promote competitive and affordable renewable energy or to alleviate costs associated with waste-to-energy and renewable energy facilities. Additionally, the charges are imposed by the Legislature on distribution IOU customers, not by the department on distribution IOUs. We conclude that the charges more closely resemble excise taxes than regulatory fees.

2. We now directly address the plaintiffs' argument that the charges are unconstitutional excise taxes under Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth, which prohibits such taxes if they are not "reasonable." An excise tax is presumed valid and "is not to be found void unless its invalidity is established beyond a rational doubt." *Andover Sav. Bank* v. *Commissioner of Revenue*, 387 Mass. 229, 235 (1982). "There is no restraint upon the power of the legislature to lay taxes, except such as the constitution of the United States or that of the state imposes." *Oliver* v. *Washington Mills*, 11 Allen 268, 270 (1865).

"The [constitutional] limitation that an excise be 'reasonable' was not intended to give to the judiciary the right to revise decisions of the Legislature that might be thought unwise or inexpedient." *Andover Sav. Bank* v. *Commissioner of Revenue*, *supra* at 235. To be considered reasonable, excises "cannot be unjustly discriminatory, arbitrary, whimsical or irrational. They cannot be plainly unequal, grossly oppressive or contrary to common right." *American Uniform Co.* v. *Commonwealth*, 237 Mass. 42, 45 (1921). In addition, the excise tax must not be

based on false and unjust principles, and must show "a proper proportion between the benefits received and the sum paid for the enjoyment of them." *Andover Sav. Bank* v. *Commissioner of Revenue, supra,* quoting *Suffolk Sav. Bank for Seamen, petitioner,* 151 Mass. 103, 105 (1890).

The plaintiffs assert that the charges are unreasonable because they are disproportional. They make this assertion on the basis that taxpayers in one municipality, who are served by distribution IOUs, pay for benefits equally available, or in the case of waste-to-energy funds, only available, to residents of another municipality, who do not pay for those benefits because they are served by MLPs. We have previously explained, in determining whether the charges constitute taxes or fees, that the benefits from the activities and programs financed from the charges extend to members of the general public, and are not limited to the customers of distribution IOUs. The fact that some MLP customers may receive some of these benefits does not render the charges unconstitutional. There is "no constitutional requirement that tax statutes be so framed that they insure absolute equality of economic impact on all persons, or that they insure equal sharing by all persons of the burdens of the tax and the benefits therefrom." *Roberts* v. *State Tax Comm'n,* 360 Mass. 724, 728 (1972). As the court explained, "[s]uch a result is neither required nor possible . . . 'mathematical uniformity in the distribution of the public burden arising from government expenses is an impossible attainment.' . . . The Constitution does not require that a tax statute exact the same amount from every person or none from any . . . ." *Id.,* quoting *Old Colony R.R.* v. *Assessors of Boston,* 309 Mass. 439, 446 (1941).

The charges are proportional. The plaintiffs do not argue that the amounts of the respective taxes are excessive, nor do they argue that the customers of distribution IOUs do not enjoy any benefits from the § 19 energy efficiency charge or the § 20 renewable energy charge. We reject the plaintiffs' contention that benefits from the § 20 waste-to-energy charge are only available to residents of MLPs. The contention ignores the facts that approximately 147 municipalities served by distribution IOUs do have waste-to-energy contracts, and that approximately nineteen municipalities with MLPs have not entered into waste-to-energy contracts. The contention also overlooks the fact that the customers from the municipalities served by distribution IOUs who do not have waste-to-energy programs do receive

some benefits from possible grants to various municipalities for such programs, such as the reduction of adverse environmental effects from these work-to-energy facilities. Last, the contention does not take into account the fact that the benefits of the § 20 waste-to-energy charge will inure to the taxpayers, not the ratepayers, of a municipality with a MLP, because the obligation of resolving municipal shortfall in meeting pollution control costs rests with the taxpayers.

The plaintiffs also argue that the charges violate the State Constitution because no material difference exists between customers of distribution IOUs, who are taxed, and customers of MLPs, who are not taxed, and because there are only nonmaterial differences between distribution IOUs and MLPs. "The Constitution permits the Legislature to make reasonable classifications of persons, property, income and expenses for different treatment under tax statutes." *Roberts* v. *State Tax Comm'n, supra* at 729. Excise tax classifications based on material differences of fact are permissible. See *Frost* v. *Commissioner of Corps. & Taxation*, 363 Mass. 235, 253 (1973). Additionally, "[a]lthough an excise tax 'must operate alike on all persons who exercise a particular employment or enjoy the same privilege or commodity,'" *Andover Sav. Bank* v. *Commissioner of Revenue, supra* at 244, quoting *Oliver* v. *Washington Mills, supra* at 279-280, "the principle does not apply where . . . the privilege enjoyed is of a different character." *Andover Sav. Bank* v. *Commissioner of Revenue, supra* at 245.

While the charges are based on the sale of a kilowatt hour of electricity, which is an essential commodity for all of the Commonwealth's citizens, the commodities being taxed by the charges are the respective privileges enjoyed by the customers of distribution IOUs, which the customers of MLPs do not enjoy. See *Minot* v. *Winthrop*, 162 Mass. 113, 120 (1894) (term "commodity" signifies "convenience, privilege, profit, and gains"). The enjoyment of these privileges by customers of distribution IOUs establishes the material differences between these customers and MLP customers, which, in turn, reasonably justify the different tax treatment between the two classes of electricity customers.

The privileges derived from the revenues from the § 19 energy efficiency charge directly and primarily benefit the customers of distribution IOUs. The funds raised by the charge are used to reimburse specific department-approved expenses

incurred by the distribution IOUs attributable to energy efficiency activities and programs provided to their customers. The department has found that, without energy efficiency activities, a distribution IOU will probably be required to install more costly distribution equipment, thereby increasing the cost of its services to its customers. The fact that some MLP customers may receive some spillover benefits from these activities does not alter the extent and nature of the benefits provided directly and primarily to customers of distribution IOUs.

With respect to the privileges derived from the revenue of the § 20 charges, customers of distribution IOUs, unlike customers of MLPs, are able to exercise choice regarding the supplier of their electricity, which, in turn, permits them to choose the source of energy being used to generate electricity, including municipal waste and renewable energy. While customers of distribution IOUs may decline to exercise this choice, and instead permit their distribution IOU to make that choice, the customers still receive a benefit that the MLP customer does not receive, namely, guaranteed rate reduction provided in the standard offer, as well as the potential benefits from the distribution IOU's choice of energy. MLP customers have no such choice, nor such resulting privileges. These differences are sufficiently distinct and material to justify the different tax treatment to customers of distribution IOUs and customers of MLPs.

The plaintiffs' additional contention, that the charges violate the State Constitution because they are improperly based on geography, misconstrues the classifications, which we have just explained. We therefore reject this contention. Further, because we have upheld the respective classification schemes under §§ 19 and 20, we need not reach the additional State constitutional challenges raised by the plaintiffs.

3. Last, we address the plaintiffs' argument that the charges violate the constitutional requirement that excise taxes further a legitimate State purpose as required by the equal protection clause of the United States Constitution. "A classification by a Legislature of property and persons for the purpose of taxation is not violative of . . . [the equal protection] clause . . . so long as any basis of fact can be reasonably conceived showing that the distinction upon which it rests has a fair and rational relation to the object sought to be accomplished by the enactment, and so long as, the classification being valid, the State deals equally with all the members of the same class." *Frost* v.

*Commissioner of Corps. & Taxation, supra* at 248, quoting *Old Colony R. R.* v. *Assessors of Boston,* 309 Mass. 439, 446 (1941). "There is a presumption of constitutionality which must prevail in the absence of some factual foundation for rejecting the classification as arbitrary or irrational." *Frost* v. *Commissioner of Corps. & Taxation, supra.*

We have already explained that there are material differences that reasonably justify differing tax treatment of customers of distribution IOUs and customers of MLPs under G. L. c. 25, §§ 19 and 20. The § 19 classification has a fair and rational relation to promoting energy efficiency through the use of the activities and programs approved by the department. As recognized by its predecessor, the Department of Public Utilities, in its May 1, 1996, order, in D.P.U. 96-100, "[e]nergy efficiency provides the opportunity for consumers to lower their electric bills . . . while enhancing customer choice, and lowering the environmental impact of providing electric service. In addition . . . energy efficiency programs further the goal of increased energy efficiency mandated in the Massachusetts Energy Plan and the National Energy Policy Act of 1992." The § 19 classification scheme is rationally related to several legitimate State interests.

The § 20 classification has a fair and rational relation to encourage the development and promotion of renewable energy projects, as well as the closure of or improvements to waste-to-energy facilities, and the accompanying environmental and economic benefits associated with these purposes, which we have already explained. The § 20 classification scheme is rationally related to several legitimate State interests.[9]

4. The case is remanded to the county court where a judgment is to be entered declaring that the contested charges are not unconstitutional in any of the aspects raised by the plaintiffs, and that, as a consequence, the plaintiffs are not entitled to the relief they seek.

*So ordered.*

---

[9]The plaintiffs have not argued that the State has dealt unequally with all the members of the same class, the classes being those customers subject to the charges. See *Frost* v. *Commissioner of Corps. & Taxation,* 363 Mass. 235, 248 (1973).