92              72 Mass. App. Ct. 92 (2008)

Indeck Maine Energy, LLC *v.* Commissioner of the Division of Energy Resources.

INDECK MAINE ENERGY, LLC, & others[1] *vs.* COMMISSIONER OF
THE DIVISION OF ENERGY RESOURCES & others.[2]

No. 06-P-1991.

Suffolk. November 14, 2007. - June 18, 2008.

Present: KAFKER, SMITH, & KATZMANN, JJ.

Further appellate review granted, 452 Mass. 1106 (2008).

*Practice, Civil,* Standing. *Administrative Law,* Standing. *Public Utilities,*
Energy company. *Renewable Energy.*

Discussion of the standing requirements for bringing an action for declaratory
relief, and the propriety of bringing a motion to dismiss to challenge an
isolated question of standing. [94-95]
Discussion of the regulated industry exception to the general rule that injury
derived from business competition does not, standing alone, suffice to
confer standing. [95-96]
Discussion of the purposes of G. L. c. 25A, § 11F, and the procedures
established in the "renewable energy portfolio standard" regulations
promulgated thereunder, in restructuring the electric utility industry. [96-97]
In a civil action, the judge erred in determining that the plaintiffs — operators
of renewable energy generating units seeking to challenge the issuance of
statements of qualification by the Division of Energy Resources (division)
to certain energy companies, enabling them to participate in a renewable
energy portfolio standard program (program) — lacked standing, where
they were participants in a regulated industry, given that the program was
entirely a creature of government, that the division influenced pricing in a
significant way, that the competitors in the industry were regulated by the
division at all stages of the process, that the division retained a substantial
continuing supervisory role over market eligibility, and that the relevant
statute embodied a scheme to promote and to control competition in the
renewable energy marketplace [97-102]; and where the plaintiffs alleged
an injury within the area of concern of the statutory and regulatory scheme,
in that they alleged that the division's procedural and substantive ir-
regularities in issuing the statements of qualification disrupted pricing in
the renewable energy credit market and inappropriately awarded the alleg-
edly nonqualifying facilities permission to participate in the Massachusetts
market [102-103].

CIVIL ACTION commenced in the Superior Court Department on
May 5, 2006.

[1]Ridgewood Providence Power Partners, L.P., and Ridgewood Rhode Island
Generation, LLC.
[2]Greenville Steam Company and Boralex Livermore Falls, Inc., interveners.

Motions to dismiss were heard by *Allan van Gestel*, J.

*Robert B. Luce*, of Vermont, for the plaintiffs.

*Sookyoung Shin*, Assistant Attorney General, for the defendant.

*M. Curtis Whittaker*, of New Hampshire, for the interveners.

KATZMANN, J. On May 5, 2006, Indeck Main Energy, LLC (Indeck), Ridgewood Providence Power Partners, LP, and Ridgewood Rhode Island Generation, LLC (the later two collectively Ridgewood), filed a complaint in the Superior Court seeking the rescission of "[s]tatement[s] of [q]ualification" issued pursuant to G. L. c. 25A, § 11F, and 225 Code Mass. Regs. §§ 14.02 and 14.06 (2002),[3] by the Division of Energy Resources (division) to Greenville Steam Company (Greenville) and Boralex Livermore Falls, Inc. (Boralex). In considering motions to dismiss pursuant to Mass.R.Civ.P. 12(b)(1), 365 Mass. 755 (1974), by Greenville and Boralex, the judge concluded that the plaintiffs did not have standing to maintain the claim and accordingly dismissed the case. The question presented in the plaintiffs' appeal is one of first impression in the Commonwealth: whether the owner or operator of a renewable energy generating unit that is an authorized participant in the renewable energy portfolio standard program established under G. L. c. 25A, § 11F, is a competitor in a regulated industry, and has alleged an injury within the area of concern of the statute or regulatory scheme, thereby according it standing to challenge governmental action threatening its competitive position. We conclude that the plaintiffs have established standing and therefore reverse the judgment of dismissal.

*Background.* Indeck, Ridgewood, Greenville, and Boralex each operate advanced biomass renewable energy facilities in Maine or Rhode Island. Pursuant to G. L. c. 25A, § 11F, and the regulations promulgated thereunder and codified at 225 Code Mass. Regs. §§ 14.01 et seq., each facility has received a statement of qualification from the division, permitting each facility to sell renewable energy certificates, otherwise known as credits, in Massachusetts[4] to retail electricity suppliers selling electricity to end-use customers. In their complaint, the plaintiffs

---

[3]All references to Title 225 of the Code of Massachusetts Regulations are to the April 26, 2002, version.

[4]In accordance with New England Power Pool Generation Information

allege certain procedural and substantive irregularities in the division's issuance of statements of qualification to Greenville and Boralex. These alleged irregularities include the division's issuance of statements of qualification to Greenville and Boralex without requiring a "[v]intage [w]aiver," 225 Code Mass. Regs. § 14.05(2); that the division inappropriately permitted Greenville and Boralex to use construction and debris wood as a renewable fuel even though it does not qualify as an eligible biomass fuel under the regulations; and that the division failed to provide the required notice and comment period prior to the issuance of the statements of qualification. The plaintiffs further allege, quoting from the division's "Policy Statement on the Re[newable] P[ortfolio] S[tandard] Eligibility of Retooled Biomass Plants" (Oct. 27, 2005), that the division's actions "threaten Plaintiffs' business positions in the [renewable energy credit] market" because "a policy change on eligibility can result in 'an influx of [renewable energy credits]' that could in turn 'severely damage the [renewable energy credit market] in Massachusetts and adversely affect the goal of the [renewal portfolio standard] program to promote the development of "new" renewable energy generating facilities.' " Moreover, the plaintiffs allege that they made substantial investments to construct and operate their facilities in order to obtain their own statements of qualification, which would be rendered unnecessary and superfluous if the division's interpretation of its regulations, as implemented in Boralex and Greenville's statements of qualification, is allowed to stand.

*Discussion.* "In order for a court to entertain a petition for declaratory relief, an 'actual controversy' sufficient to withstand a motion to dismiss must appear on the pleadings." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 292 (1977), quoting from G. L. c. 231A, § 1. In addition, the particular plaintiffs bringing the action must demonstrate the requisite legal standing to secure a resolution of the actual controversy. *Massachusetts Assn. of Indep.*

System Operation Rules 2.1(a) (2004), a renewable energy credit is awarded for every megawatt-hour of electricity produced. Each credit, once purchased, is counted towards the retail electricity supplier's compliance with renewable energy portfolio standards, discussed *infra*, which require purchases of renewable energy from qualifying renewable energy generators.

*Agents & Brokers, Inc., supra.* "The purpose of both the actual controversy and the standing requirements is to ensure the effectuation of the statutory purpose of G. L. c. 231A, which is to enable a court 'to afford relief from . . . uncertainty and insecurity with respect to rights, duties, status and other legal relations.' " *Galipault* v. *Wash Rock Invs., LLC,* 65 Mass. App. Ct. 73, 84 (2005), quoting from G. L. c. 231A, § 9.

As the sole question presented here is one of standing, the defendants' challenge by way of a Mass.R.Civ.P. 12(b)(1) motion to dismiss was proper. *Ginther* v. *Commissioner of Ins.,* 427 Mass. 319, 322 (1998).[5] "A party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc., supra* at 293. "While standing requirements should be liberally construed for declaratory judgment purposes, the requirement that a party assert a legally cognizable injury, i.e., one within the area of statutory or regulatory concern, limits the nature of those disputes that can, in fact, be heard." *Massachusetts Assn. of Cosmetology Schs., Inc.* v. *Board of Registration in Cosmetology,* 40 Mass. App. Ct. 706, 708 (1996).

In the present case, it is undisputed that the plaintiffs' allegations of injury derive from business competition. "Normally, an injury derived from business competition is not sufficient to confer standing." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc., supra* at 293. "This rule does not apply, however, to competitors in a regulated industry . . . who are attempting to challenge governmental action threatening their competitive position." *Ibid.,* quoting from *Everett Town Taxi, Inc.* v. *Aldermen of Everett,* 366 Mass. 534, 538 (1974). In order to fall within this regulated industry exception, the plaintiffs must show as a matter of law that "the alleged injury is within the parameters of the statutory concern" of G. L. c. 25A, § 11F, and that the "injury alleged is inconsistent with the aims and purposes of the entire regulatory scheme." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc., supra* at 294. "Inherent in the nature

___

[5]The judge decided the standing issue as matter of law. Accordingly, we review that pure legal conclusion de novo. See *Anastos* v. *Sable,* 443 Mass. 146, 149 (2004).

of [the governmental] obligations [in the administration of the regulatory scheme] are certain expressed public policies or concerns which can be vindicated by allowing those injured by official action allegedly inconsistent with these policies to challenge them." *Ibid.* Only in such circumstances do the plaintiffs, as intra-industry competitors, have standing to contest a governmental action that allegedly causes them harm. See *Cablevision Sys. Corp.* v. *Department of Telecommunications & Energy*, 428 Mass. 436, 438 (1998), and cases cited. We therefore begin with an analysis of the purposes G. L. c. 25A, § 11F.

General Laws c. 25A, § 11F, was enacted in 1997 as part of a bill that restructured the electric utility industry in Massachusetts to establish consumer electricity rate savings through market-based competition. St. 1997, c. 164, § 50. See generally *Shea* v. *Boston Edison Co.*, 431 Mass. 251 (2000). The "key feature" of Massachusetts's restructuring effort was the unbundling of the process of providing electricity to end-use consumers, which was accomplished by requiring the strict corporate separation of the responsibilities for generation, transmission, distribution, and retail sale of electricity. Alperin & Chase, Consumer Law § 27.4 (2d ed. 2001). It was anticipated that the introduction of competition in each stage of the generation and distribution process would encourage innovation and efficiency and improve service for all market participants. St. 1997, c. 164, §§ 1(*f*) & (*g*).

Encompassed within the purview of St. 1997, c. 164, was the Legislature's intention to promote renewable energy production, which it linked with long-term rate reduction and the fostering of competitive balance in Massachusetts's utilities market. See St. 1997, c. 164, § 1(l) ("the primary elements of a more competitive electricity market will be customer choice, preservation and augmentation of consumer protections, full and fair competition in generation, and enhanced environmental protection goals"). The Legislature attempted to accomplish this goal, in part, by enacting G. L. c. 25A, § 11F, which establishes the renewable energy portfolio standard. Section 11F of c. 25A requires all retail electricity suppliers selling electricity to end-use customers to supply a certain percentage of that electricity

from new renewable energy generating sources.[6] In order to satisfy the renewable energy portfolio standard, retail electricity suppliers must purchase the quantity of renewable energy credits specified by the division from qualifying renewable energy generating units as so designated by the division. See 225 Code Mass. Regs. §§ 14.07-14.09.

The division has promulgated "renewable energy portfolio standard" regulations to establish a procedure by which the owner or operator of a qualifying generating unit can obtain a license — known as a statement of qualification — to sell renewable energy credits to retail electricity suppliers. 225 Code Mass. Regs. § 14.06. In order to obtain a statement of qualification, an owner or operator must first submit an application to the division. 225 Code Mass. Regs. § 14.06(1). The division then evaluates the application to determine if the generating unit meets the eligibility requirements. *Ibid.* If an owner or operator receives a statement of qualification, the generating unit remains subject to periodic emissions testing by the Department of Environmental Protection and an obligation to report changes in operation to the division. 225 Code Mass. Regs. § 14.06(3). Once an owner or operator obtains a valid statement of qualification, it may sell the renewable energy credits accrued from renewable electricity generation to Massachusetts retail electricity suppliers. See 225 Code Mass. Regs. §§ 14.07-14.09.

With this understanding of the purposes of G. L. c. 25A, § 11F, we turn to the judge's ruling that, as pleaded, the plaintiffs were not in a "regulated industry," as that term is used to determine standing, and did not meet the regulated industry exception. In addressing the issue, the judge concluded that the purpose of G. L. c. 25A, § 11F, is "to promote the use of renewable energy in generating power in the electric market in Massachusetts" and that the statute does not "regulate competition, nor does it control pricing or the market in which electricity is generated and sold." The judge further concluded that issuance

---

[6]To qualify as a new renewable energy generating source, a facility must have commenced operation (or added the new generation) after December 31, 1997, and generate electricity from certain specified renewable technologies. G. L. c. 25A, § 11F.

of the statement of qualification "is not a control over competition or pricing," that the role of the division under the statute is "that of a gatekeeper, not a regulator," and that "[o]nce an entity is through the gate, the market in [renewable energy credits] is essentially and wholly unregulated." This analysis, which fails to take into account the considerable authority that the Legislature granted the division to establish, develop, and administer the renewable energy credit market, was in error.

Here, we are persuaded that renewable energy generators participating in the renewable energy portfolio standard program created under G. L. c. 25A, § 11F, are part of a regulated industry as that term has been used in determining standing under the regulated industry exception. While there is no formally-stated test in Massachusetts jurisprudence for determining when an industry is "regulated," we take note of several factors, including those distilled from the cases which have discussed the applicability of the regulated industry exception.

We begin with the important point that the renewable energy portfolio program, which is the responsibility of the division, is entirely a creature of government. As we have discussed, G. L. c. 25A, § 11F, was enacted, in part, to require retail suppliers of electricity in Massachusetts to purchase a certain percentage of their electricity sales portfolio from renewable energy generators. G. L. c. 25A, § 11F. It was enacted to foster competition in a dormant renewable energy market. The effectuation of that goal and program is lodged largely in the intervention and oversight by the division.

The defendants counter that the renewable energy portfolio program was part of a legislative deregulation scheme to unbundle the process of providing electricity to end users and that thus, by definition, the renewable energy portfolio standard program cannot be characterized as implicating or creating a "regulated industry." We think that such an argument is unpersuasive and sweeps too broadly. Here, the statutory scheme does not contemplate governmental abdication of involvement in the energy markets, but a restructuring of the roles of participating entities. Moreover, and very significantly, the defendants' characterization is inapposite because relevant aspects of the legislation at issue actually regulate *renewable* energy purchases by creating

a market that would not otherwise exist. In accordance with the express purpose of G. L. c. 25A, § 11F, and the stated purpose of St. 1997, c. 164, the division thus is tasked with regulating retail electricity suppliers to achieve long-term competitive balance and consumer rate reductions.[7] Absent c. 25A, § 11F, a retail electricity supplier in Massachusetts would have no obligation to purchase renewable electricity for its customers. The division's role under c. 25A, § 11F, is especially significant given the Legislature's determination that, as part of the long-term plan for reducing consumer electricity rates, the promotion of renewable electricity generation is necessary. G. L. c. 25A, § 11F. St. 1997, c. 164, § 1(l).

It is also significant, as an indicium of a government-dependent artificial market — subject to regulation with resulting price impact — that the division retains the exclusive control over the annual percentage of the electricity portfolio that must be comprised of renewable energy and must be purchased from the market established by the Legislature and administered by the division. As G. L. c. 25A, § 11F(*a*), sets forth: "Every retail supplier shall provide a minimum percentage of kilowatt-hours sales to end-use customers . . . from new renewable energy generating sources, according to the following schedule: (i) an additional 1 per cent of sales by December 31, 2003, or one calendar year from the final day of the first month in which the average cost of any renewable technology is found to be within 10 per cent of the overall average spot-market price per kilowatt-hour . . . , whichever is sooner; (ii) an additional one-half of 1 per cent of sales each year thereafter until December 31, 2009; and (iii) an additional 1 per cent of sales every year thereafter until a date determined by the division of energy resources." See 225 Code Mass. Regs. § 14.07(1) (establishing cumulative minimum percentage of renewable power a retail electricity supplier must purchase), and § 14.07(2) (giving the division the power to suspend the annual one-half percent increase after 2009 as well as the discretion as to when to reinstitute the

---

[7]As we have noted, one means the Legislature used to achieve this purpose was the creation of a renewable energy portfolio standard — essentially a market for the sale of renewable electricity credits — which would foster the development of renewable electricity generation in Massachusetts.

increase). As such, the division is not a passive gatekeeper, but retains considerable discretion over the present and future demand by retail electricity suppliers for renewable energy credits. See *South Shore Natl. Bank* v. *Board of Bank Incorporation,* 351 Mass. 363, 367-368 (1966) (defendant's statutory requirement to account for the effect bank relocation had on competitors was of import in establishing standing under the regulated industry theory). In this manner, the division influences, in a significant way, the pricing of renewable energy credits.[8] This impact distinguishes the present case from our earlier decision in *Massachusetts Assn. of Cosmetology Schs., Inc.,* where the applicable statute specifically stated that the board of registration in cosmetology was not authorized "to regulate or fix compensation or prices." 40 Mass. App. Ct. at 709 (purpose of the statute did "not encompass the control of competition or pricing in the . . . industry").[9]

Another indicium of a regulated industry, present here, is that the competitors are regulated by the division at all stages of the process. Thus, at the very outset, the division maintains control over market entry. As we have noted, the division defines the market participants in a very real way and exercises exclusive control over the minimum annual percentage each retail supplier must purchase from renewable energy generating sources. Greenville and Boralex acknowledge that the division "has broad discretion in establishing the criteria for qualifying generators." In order to receive a statement of qualification, an owner or operator seeking to qualify a generating unit must prepare a detailed application, submit to a thorough review by the division, and satisfy the eligibility requirements of 225 Code Mass. Regs. § 14.06.

[8]As retail electricity suppliers may "bank" renewable generation credits for use in future compliance, the division's discretionary control over post-2009 percentages is particularly relevant. See 225 Code Mass. Regs. § 14.08(3).

[9]While the defendants claim that the regulated industry exception requires that an agency actually control or fix pricing within the industry, there is no case that so holds. Rather, the tenor of the cases is consistent with a requirement that the agency's decision must affect in a meaningful way the over-all parameters of competition, which may include the price of the good or service. See, e.g., *South Shore Natl. Bank* v. *Board of Bank Incorporation, supra* at 367-368 (banking industry); *Everett Town Taxi, Inc.* v. *Aldermen of Everett,* 366 Mass. at 538 (taxicabs).

Only after receiving the statement of qualification is the owner or operator entitled to sell renewable energy credits accrued at its facility to retail electricity providers in Massachusetts to allow those providers to satisfy the renewable energy portfolio standard. While this degree of regulation, considered alone, may not be outcome determinative, see *Massachusetts Assn. of Cosmetology Schs., Inc., supra* at 709 (licensing and operating requirements alone are insufficient to make participants part of a regulated industry), it is a relevant factor in determining whether a regulated industry exists for the purpose of standing analysis.[10]

Furthermore, the division retains a substantial continuing supervisory role over market eligibility. This includes the requirement that the owner or operator of a qualifying facility notify the division of any change in eligibility status. 225 Code Mass. Regs. § 14.06(3). In addition, the division may "suspend or revoke a Statement of Qualification" for noncompliance with the applicable regulations. 225 Code Mass. Regs. § 14.06(4). By maintaining this continuing involvement with respect to market eligibility, the division has considerable ongoing influence over the supply of renewable energy credits reaching its market.

Finally, we note that another indicium of a regulated industry is a scheme designed to promote reasonable competition within the industry or to protect intra-industry competitors from an uneven playing field. *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.,* 373 Mass. at 295. See generally Breyer, Regulation and Its Reform 15-35 (1982) (variety and mixture of rationales). The judge here concluded that the renewable energy portfolio program cannot be a regulated industry on the ground that G. L. c. 25A, § 11F, only creates incentives for use of renewable energy sources, but does not impose restraints on competition. However, as we have discussed, the statute here embodies a scheme to promote and to control competition in the renewable energy marketplace. This includes specific language

---

[10]Insofar as the defendants appear to argue that to satisfy the regulated industry exception, the plaintiffs must establish that the government issued mutually exclusive privileges or licenses, we note that the exception has been applied and standing found in cases involving multiple competitor/nonexclusive licensing situations. See *Everett Town Taxi, Inc.* v. *Aldermen of Everett,* 366 Mass. at 538-539; *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.,* 373 Mass. at 294.

restricting energy source types and inclusion of energy based on the operation dates of certain facilities. Promotion of competition by maintaining a level playing field is a valid purpose for the regulated industry exception. See *Everett Town Taxi, Inc.* v. *Aldermen of Everett*, 366 Mass. at 538-539 (multiple taxicab companies operating in Everett had standing to sue other competing taxicab companies based on allegation of conflict of interest; "competitors of those receiving favored treatment ought to be within the class of persons protected and thereby have standing to sue under the statute"). This component of promotion of competition distinguishes the renewable portfolio program from other cases where that component was absent, and where the regulated industry exception did not apply so as to confer standing for competitors.[11] See, e.g., *Massachusetts Assn. of Cosmetology Schs., Inc., supra* at 708-709 (statutory scheme did not attempt to control or promote competition in the industry; in fact, a specific statutory provision essentially stated that the board could not restrict or control competition); *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. 427, 429-430 (1949) (concern was land use regulation, not protection or control of competition).

As we have concluded, in light of the foregoing factors, that competitors in the renewable energy portfolio program participate in a regulated industry, we must next consider the second prong of the regulated industry exception — whether the plaintiffs' claims fall within the scope of the statute so as to show "sufficient injury to establish standing." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc., supra* at 294. See *Enos* v. *Secretary of Environmental Affairs*, 432 Mass. 132, 135 (2000). Here, the plaintiffs' claims do fall within the scope of G. L. c. 25A, § 11F, as they allege that the division's procedural

---

[11]We note that while it might be the case that the statutory framework also regulates retail electricity suppliers by mandating purchase of renewable energy credits, that objective neither diminishes nor is inconsistent with our determination that the renewable energy generators are direct participants in a regulated industry and market. We further note that as the current market is designed, those suppliers have no real incentive to ensure fair play between the renewable energy generators. Given that the division has allegedly issued impermissible statements of qualification, the only market participants with any real incentive to ensure that renewable energy generators are abiding by the applicable regulations are competing generators.

and substantive irregularities in issuing the statements of qualification disrupted pricing in the renewable energy credit market and inappropriately awarded the allegedly nonqualifying facilities permission to participate in the Massachusetts market. These alleged irregularities, which purportedly permitted an influx of inappropriately granted renewable energy credits into the Massachusetts market, threaten the plaintiffs' competitive position in that market by forcing them to compete against renewable generating units allegedly using impermissible fuel sources. The plaintiffs allege that these units did not necessarily require the substantial construction investments required to obtain a statement of qualification and now have lower operating costs due to the impermissible fuel sources — resulting in a competitive disadvantage to the plaintiffs who have complied with the regulations. The division's purported actions, if substantiated, disrupt the renewable electricity credit market and frustrate the promotion of competitive renewable electricity generation in Massachusetts. See *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.,* *supra* at 295 (where the Legislature defined goals including precluding unreasonable competition and discriminatory rate setting, the plaintiffs, who were participants in the industry, alleged unreasonable competition and business injury, satisfying standing). The division's alleged allowance of impermissible fuel sources does not foster actual, renewable energy generation in Massachusetts and is thus inherently inconsistent with the intent of St. 1996, c. 164, and G. L. c. 25A, § 11F. As they have alleged, the "[p]laintiffs have an interest in ensuring that the [renewable energy credits] market is not diluted by power that is not truly 'new' (i.e. post-1998) and 'renewable' (i.e., based on use of organic materials as opposed to [construction and demolition debris])." In sum, the plaintiffs have alleged an economic and competitive injury "which on its face implicates the effectuation of [the] important public policies . . . within the statutory zone of concern" embodied in G. L. c. 25A, § 11F. *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.,* 373 Mass. at 295. Accordingly, we conclude that the plaintiffs have established standing. The judgment of the Superior Court of October 2, 2006, is reversed, and the case is remanded for further proceedings.

*So ordered.*