INDECK MAINE ENERGY, LLC, & others[1] *vs.* COMMISSIONER OF
ENERGY RESOURCES & others.[2]

Suffolk. April 7, 2009. - August 11, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Practice, Civil,* Standing. *Administrative Law,* Standing. *Public Utilities,*
Energy company. *Renewable Energy.*

Discussion of standing to challenge an administrative agency's actions, and
   the regulated industry exception to the general rule that injury derived
   from business competition is not sufficient to confer standing. [516-518]
Discussion of G. L. c. 25A, § 11F, which was enacted as part of a restructur-
   ing of the electric utility industry in Massachusetts, and associated regula-
   tions establishing the procedure by which a renewable energy generating
   facility can obtain a statement of qualification to sell renewable energy
   credits to retail electricity suppliers. [518-520]
In a civil action brought by certain owners and operators of renewable energy
   generating facilities authorized to participate in the renewable energy
   portfolio standard program established pursuant to G. L. c. 25A, § 11F
   (plaintiffs and interveners), the judge correctly concluded that the plaintiffs
   and interveners did not have standing to challenge governmental actions
   permitting other facilities to participate in the program (thereby threatening
   the plaintiffs' and interveners' competitive position), where the plaintiffs
   and interveners did not come within the regulated industry exception to the
   general rule that injury derived from business competition is not sufficient
   to confer standing, in that the Legislature, in enacting G. L. c. 25A, § 11F,
   intended to induce the promotion and expansion of the renewable energy
   generating market, not to create a barrier to market entry by protecting and
   thereby conferring standing to sue on existing competitors. [520-526]

CIVIL ACTION commenced in the Superior Court Department on
May 5, 2006.

Motions to dismiss were heard by *Allan van Gestel,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

[1]Ridgewood Providence Power Partners, LP, and Ridgewood Rhode Island
Generation, LLC.                                                            .
[2]Greenville Steam Company and Boralex Livermore Falls, Inc. (Boralex),
interveners.

*William J. Dodge*, of Vermont, for the plaintiffs.

*Sookyoung Shin*, Assistant Attorney General, for the defendant.

*M. Curtis Wittaker*, of New Hampshire, for the interveners.

CORDY, J. On further appellate review, we must decide whether owners and operators of renewable energy generating facilities authorized to participate in the renewable energy portfolio standard program established pursuant to G. L. c. 25A, § 11F, have standing to challenge governmental actions permitting other facilities to participate in the program, thereby threatening their competitive position. Because we conclude that the effect on the competitive position of such owners and operators does not fall within the area of concern sought to be protected or furthered by the statute, they do not have standing to sue for their purported injuries, and we therefore affirm the judgment of dismissal entered in the Superior Court.

*Background.* The plaintiffs, Indeck Maine Energy, LLC (Indeck); Ridgewood Providence Power Partners, LP; and Ridgewood Rhode Island Generation, LLC (the latter two collectively Ridgewood), as well as the interveners, Greenville Steam Company (Greenville) and Boralex Livermore Falls, Inc. (Boralex), each operate advanced biomass renewable energy facilities in New England.[3] All of their facilities were originally placed into service prior to 1998. Each facility has received a statement of qualification as a "new renewable energy generating source" from the Department of Energy Resources (department).[4] Having obtained statements of qualification, the facilities are permitted to sell renewable energy certificates (also known as credits) to retail electricity suppliers selling electricity to end-use customers in Massachusetts. See G. L. c. 25A, § 11F; 225 Code Mass. Regs. §§ 14.01 (2002).[5] A credit, once purchased, is counted toward

---

[3]Generally speaking, an advanced biomass renewable energy facility is one that generates electricity using low-emission technologies "such as gasification using such biomass fuels as wood, agricultural, or food wastes, energy crops, biogas, biodiesel, or organic refuse-derived fuel." G. L. c. 25A, § 11F (*b*).

[4]At the time this lawsuit was filed, the agency was called the division of energy resources. G. L. c. 25A, § 1, as amended by St. 1989, c. 730, § 4. The name has since been changed to the Department of Energy Resources. St. 2008, c. 169, § 12. We refer to the agency by its current name.

[5]All references to Title 225 of the Code of Massachusetts Regulations are to

the retail electricity supplier's compliance with the renewable energy portfolio standard, which requires purchases of renewable energy from qualifying renewable energy generators. See *infra* at 518-520.

On May 5, 2006, Indeck and Ridgewood filed a complaint in the Superior Court against the department seeking the rescission of the statements of qualification issued to Greenville and Boralex pursuant to G. L. c. 25A, § 11F, and 225 Code Mass. Regs. §§ 14.02 and 14.06. The complaint sought injunctive and declaratory relief or, in the alternative, relief in the nature of mandamus. It alleged irregularities in the department's issuance of statements of qualification to Greenville and Boralex, including that they were issued without requiring a "[v]intage [w]aiver," 225 Code Mass. Regs. § 14.05(2),[6] and without the required notice and comment period. The complaint also alleged that the department inappropriately permitted Greenville and Boralex to use construction and debris wood as a renewable fuel.

With respect to their standing to sue, the plaintiffs alleged that they made substantial investments to construct and operate their facilities before applying for and obtaining their statements of qualification, and that the department's "actions threaten [their] business positions in the [renewable energy credit] market." More specifically, the plaintiffs alleged that in order to obtain their statements of qualification, the department required them to

the April 26, 2002, version, which was in effect when the statements of qualification at issue were granted and when the Superior Court action was filed. Cf. 13A C.A. Wright, A.R. Miller, & E.H. Cooper, Federal Practice and Procedure § 3531, at 8-9 (2008) ("standing must exist at the time an action is filed"). Likewise, all references to G. L. c. 25A, § 11F, are to the statute as originally inserted by St. 1997, c. 164, § 50, because the statute was not amended until long after the statements of qualification at issue were granted and the Superior Court action was filed. See St. 2008, c. 169, § 32 (effective July 2, 2008).

[6]To be considered a new renewable generation facility permitted to participate in the renewable energy portfolio standard program, a generation facility must have begun its commercial operation after December 31, 1997, unless the facility receives a vintage waiver. 225 Code Mass. Regs. § 14.05(1)(b), (2). If a generation facility is located on a site where electricity was generated between the years 1995 and 1997, that facility must also receive a vintage waiver. *Id.* at § 14.05(1)(d)(2), (3). The vintage waiver regulations only permit the electrical energy output that exceeds a facility's "Historical Generation Rate" (i.e., average annual electrical production between 1995 and 1997) to qualify as new renewable generation. *Id.* at §§ 14.02, 14.05(2).

obtain vintage waivers (which reduced the output of their facilities that could be counted toward renewable energy credits) while not requiring Greenville and Boralex, although similarly situated, to obtain such waivers. In addition, the plaintiffs alleged that the department further "threatens [their] competitive position" by issuing statements of qualification to Greenville and Boralex even though those facilities use construction and debris wood as fuel, contrary to the regulation defining eligible biomass fuel. Quoting from the department's own "Policy Statement on the [Renewable Energy Portfolio Standard] Eligibility of Retooled Biomass Plants" (Oct. 27, 2005), the plaintiffs alleged that a policy change on eligibility can result in "an influx of [renewable energy credits]" that could in turn "severely damage the [renewable energy credit] market in Massachusetts and adversely affect the goal of the [renewable energy portfolio standard] program to promote the development of 'new' renewable energy generating facilities." Finally, the plaintiffs alleged that the Massachusetts renewable energy portfolio standard program is a "regulated industry"; that the plaintiffs' interest in ensuring that the department does not either violate the laws relating to the program or "unlawfully expand or disregard its own regulations" falls within an area of concern of the statute establishing and governing the program; and that the department's actions causing the plaintiffs' injuries are "inconsistent with the aims and purposes of the entire regulatory scheme."

The department filed a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), and after their motions to intervene were allowed, Greenville and Boralex did the same. A Superior Court judge determined that the plaintiffs lacked the requisite standing to sue and dismissed the case. The judge reasoned that "injury from business competition is insufficient to confer standing to challenge government action" unless the plaintiffs are "competitors in a regulated industry." He then concluded that the plaintiffs were not participants in a "regulated industry," as that term is presently understood, because G. L. c. 25A, § 11F, does not regulate competition, control pricing, or control the market in which electricity is generated and sold. The judge characterized the department's role as one of "a gatekeeper, not a regulator."

In a well-reasoned opinion, the Appeals Court disagreed with this conclusion, reversed the judgment of dismissal, and remanded the case for further proceedings. See *Indeck Me. Energy, LLC* v. *Commissioner of the Div. of Energy Resources*, 72 Mass. App. Ct. 92 (2008). After noting that "there is no formally-stated test in Massachusetts jurisprudence for determining when an industry is 'regulated,' " the Appeals Court pointed to several factors that led it to conclude that the plaintiffs were part of a regulated industry and had established standing to sue. *Id.* at 98. Those factors were as follows: the renewable energy portfolio standard program is "entirely a creature of government"[7]; the department "retains the exclusive control over the annual percentage of the electricity portfolio that must be comprised of renewable energy and must be purchased from the market established by the Legislature and administered by the [department]"[8]; "the competitors are regulated by the [department] at all stages of the

---

[7]Five New England States, including Massachusetts, have renewable energy portfolio standard programs that compete in a regional market for renewable energy credits that can be generated in all six New England States, New York, New Brunswick, Prince Edward Island, Nova Scotia, and Quebec. See Massachusetts Renewable Energy Portfolio Standard: Annual RPS Compliance Report for 2007 (Department of Energy Resources Nov. 24, 2008).

[8]General Laws c. 25A, § 11F (*a*), sets forth a schedule establishing an annually increasing minimum percentage of retail suppliers' sales to end-use customers that must come from new renewable energy generating sources. As originally enacted, that schedule provided:

> "Every retail supplier shall provide a minimum percentage of kilowatt-hours sales to end-use customers in the commonwealth from new renewable energy generating sources, according to the following schedule: (i) an additional 1 per cent of sales by December 31, 2003, or one calendar year from the final day of the first month in which the average cost of any renewable technology is found to be within 10 per cent of the overall average spot-market price per kilowatt-hour for electricity in the commonwealth, whichever is sooner; (ii) an additional one-half of 1 per cent of sales each year thereafter until December 31, 2009; and (iii) an additional 1 per cent of sales every year thereafter *until a date determined by the division of energy resources*" (emphasis added).

St. 1997, c. 164, § 50. A 2008 amendment, which became effective July 2, 2008, deleted the italicized language above, and thereby circumscribed the department's authority to affect the annual increase after 2009. The statute now provides:

> "Every retail supplier shall provide a minimum percentage of kilowatt-hours sales to end-use customers in the commonwealth from

process"; and G. L. c. 25A, § 11F, "embodies a scheme to pro-
mote and to control competition in the renewable energy market-
place." *Indeck Me. Energy, LLC* v. *Commissioner of the Div. of
Energy Resources, supra* at 98-102. Finally, the Appeals Court
concluded that the plaintiffs had established standing because
their claims "fall within the scope of G. L. c. 25A, § 11F, as they
allege that the [department's] procedural and substantive irregular-
ities in issuing the statements of qualification disrupted pricing in
the renewable energy credit market and inappropriately awarded
the allegedly nonqualifying facilities permission to participate in
the Massachusetts market." *Id.* at 102-103. We granted the
department's application for further appellate review.[9]

*Discussion.* Because the Superior Court judge decided the
standing issue as a matter of law, we review that legal conclusion
de novo. See *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004).

Standing is an issue of subject matter jurisdiction that is
properly challenged by way of a motion to dismiss under rule
12 (b) (1). *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 322
(1998). Neither G. L. c. 231A (declaratory judgment) nor G. L.
c. 249, § 5 (mandamus), provides an independent statutory
basis for standing. See *Enos* v. *Secretary of Envtl. Affairs*, 432

---

new renewable energy generating sources, according to the following
schedule: (1) an additional 1 per cent of sales by December 31, 2003,
or 1 calendar year from the final day of the first month in which the
average cost of any renewable technology is found to be within 10 per
cent of the overall average spot-market price per kilowatt-hour for
electricity in the commonwealth, whichever is sooner; (2) an additional
one-half of 1 per cent of sales each year thereafter until December 31,
2009; and (3) *an additional 1 per cent of sales every year thereafter*"
(emphasis added).

St. 2008, c. 169, § 32.

[9]Greenville and Boralex filed an application for further appellate review
with this court. The department then filed its own application. Greenville and
Boralex withdrew their application, however, after they settled their disagree-
ment with the plaintiffs. The parties had requested that the Appeals Court
withdraw or vacate its decision because the underlying dispute between the
plaintiffs and interveners had become moot. The Appeals Court denied their
motion. The department then filed a supplement to its application for further
appellate review, and we granted the department's application. Although the
underlying controversy was rendered moot by the settlement between the
plaintiffs and interveners, we exercise our discretion to address the merits. See
*Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 782-784 (1984) (Supreme Judicial
Court has discretion to decide moot cases).

Mass. 132, 135 (2000); *Perella* v. *Massachusetts Turnpike Auth.*, 55 Mass. App. Ct. 537, 539 (2002). Consequently, to establish standing to challenge administrative agency actions, a plaintiff must "allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred."[10] *Massachusetts Ass'n of Indep. Ins. Agents & Brokers* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977), and cases cited. That is, to have standing here the plaintiffs' interests "must come within the ' "zone of interests" arguably protected by [G. L. c. 25A, § 11F].' " *Enos* v. *Secretary of Envtl. Affairs, supra* at 135, quoting *Penal Insts. Comm'r for Suffolk County* v. *Commissioner of Correction*, 382 Mass. 527, 532 (1981).

Normally, an injury derived from business competition is not sufficient to confer standing. *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. 427, 429 (1949). We have stated, however, that "[t]his rule does not apply . . . to competitors in a regulated industry . . . who are attempting to challenge governmental action threatening their competitive position." *Everett Town Taxi, Inc.* v. *Aldermen of Everett*, 366 Mass. 534, 538 (1974) (*Everett*), and cases cited. In such circumstances, "[n]ot only must the particular statute under which the violation is alleged to have occurred be examined in order to see whether the alleged injury is within the parameters of the statutory concern but . . . we must ascertain whether the type of injury alleged is inconsistent with the aims and purposes of the entire regulatory scheme. If the injury alleged is within the scope of those concerns . . . a challenger has shown sufficient injury to establish standing." *Massachusetts Ass'n of Indep. Ins. Agents & Brokers* v. *Commissioner of Ins., supra* at 294. We decide whether standing exists by examining several considerations, including the language of the statute, the Legislature's intent and purpose in enacting the statute, the nature of the

[10]Under the declaratory judgment statute, in addition to establishing standing, a plaintiff must establish that an "actual controversy" exists. See *Massachusetts Ass'n of Indep. Ins. Agents & Brokers* v. *Commissioner of Ins.*, 373 Mass. 290, 292 (1977), quoting G. L. c. 231A, § 1. The sole issue on appeal in this case, however, is whether the plaintiffs have standing to sue. The existence of an actual controversy has not been challenged. Cf. *id.* at 293 ("In the sense that the matter at issue here involves a dispute over an official interpretation of a statute and the validity of a regulation promulgated pursuant to that interpretation, a justiciable controversy exists").

administrative scheme, decisions on standing, and any adverse effects that might occur if standing is recognized. *Enos* v. *Secretary of Envtl. Affairs, supra* at 135-136.

We begin with an analysis of the statutory scheme. General Laws c. 25A, § 11F, was enacted in 1997 as part of an act that restructured the electric utility industry in Massachusetts "from a government regulated monopoly to a framework under which competitive producers supply electric power and customers gain the right to choose their electric power supplier." H.J. Alperin & R.F. Chase, Consumer Law § 27:4, at 693 (2d ed. 2001). See St. 1997, c. 164. See generally *Shea* v. *Boston Edison Co.,* 431 Mass. 251, 253-258 (2000). The goals of the restructuring legislation included "reduc[ing] the cost of electric power to Massachusetts consumers," "increas[ing] reliance on renewable energy sources," and "promot[ing] energy efficiency programs." H.J. Alperin & R.F. Chase, *supra* at 694.

More specifically, the Legislature determined that "restructuring the electricity industry in the commonwealth [would] foster competition and promote reduced electricity rates," St. 1997, c. 164, § 1, last par., and that "the introduction of competition in the electric generation market [would] encourage innovation, efficiency, and improved service from all market participants, and [would] enable reductions in the cost of regulatory oversight." St. 1997, c. 164, § 1 (*f*). See *id.* at § 1 (*g*) (listing benefits of "competitive markets in generation"). Significantly, the Legislature declared that "long-term rate reductions can be achieved most effectively by increasing competition and enabling broad consumer choice in generation service, thereby allowing market forces to play the principal role in determining the suppliers of generation for all customers." *Id.* at § 1 (*k*). The Legislature also declared that "the interests of consumers can best be served by an expedient and orderly transition from regulation to competition in the generation sector consisting of the unbundling of prices and services and the functional separation of generation services from transmission and distribution services." *Id.* at § 1 (*m*). Finally, the Legislature declared that "the primary elements of a more competitive electricity market will be customer choice, preservation and augmentation of consumer protections, full and fair competition in generation, and enhanced environmental protection goals." St. 1997, c. 164, § 1 (*l*).

The Legislature sought to achieve its declared enhanced environmental protection goals through the enactment of G. L. c. 25A, § 11F, establishing the renewable energy portfolio standard. Section 11F requires all retail electricity suppliers selling electricity to end-use customers in Massachusetts to supply a minimum percentage of that electricity from "new renewable energy generating sources." G. L. c. 25A, § 11F (*a*). A "renewable energy generating source" is one that generates electricity using certain renewable technologies specified in the statute. See *id.* at § 11F (*b*).[11] The Legislature granted the department the discretion both to "consider any previously operational biomass facility retrofitted with advanced conversion technologies [to be] a renewable energy generating source," and to add technologies or technology categories to the statutory list after conducting administrative proceedings. *Id.* A "new" renewable energy generating source is one that begins operation after December 31, 1997, or represents an increase in generating capacity after that date at an existing facility. *Id.* at § 11F (*a*). The statute also sets out a schedule establishing an annually increasing minimum percentage of retail suppliers' sales that must come from new renewable energy generating sources. *Id.* See note 8, *supra.* To satisfy this renewable energy portfolio standard, retail electricity suppliers must ordinarily purchase the quantity of renewable energy credits specified by the department (as dictated by G. L. c. 25A, § 11F) from renewable energy generation facilities (units) qualified by the department. See 225 Code Mass. Regs. §§ 14.07-14.09.[12]

The department has promulgated regulations establishing the

[11]To qualify as a "renewable energy generating source," a facility must generate electricity using one of a number of specified technologies, including (among others) "solar photovoltaic," "wind energy," "ocean thermal, wave or tidal energy," and "low-emission, advanced biomass power conversion technologies, such as gasification using such biomass fuels as wood, agricultural, or food wastes, energy crops, biogas, biodiesel, or organic-refuse derived fuel." G. L. c. 25A, § 11F (*b*). The department may add technologies or technology categories to this list, but only after conducting administrative proceedings. *Id.*

[12]Although this is the standard means of complying with the renewable energy portfolio standard, an alternative means of compliance exists as well. The alternative compliance procedure requires a retail electricity supplier to make an "[a]lternative [c]ompliance [p]ayment" to the Massachusetts Technology Park Corporation, established by G. L. c. 40J. See 225 Code Mass. Regs.

procedure by which a renewable energy generating facility can obtain a statement of qualification to sell renewable energy credits to retail electricity suppliers. 225 Code Mass. Regs. § 14.06. The owner or operator of the facility must submit an application to the department, *id.* at § 14.06(1), which is evaluated to determine if the facility meets the eligibility requirements. *Id.* If an owner or operator obtains a valid statement of qualification, it may sell the renewable energy credits accrued from renewable electricity generation to Massachusetts retail electricity suppliers. See *id.* at §§ 14.07-14.09. An owner or operator that receives a statement of qualification has an obligation to report to the department changes in operation "that would affect the eligibility of the Unit as a New Renewable Generation Unit." *Id.* at § 14.06(3). Finally, the department may suspend or revoke a statement of qualification for failure to comply with the applicable regulations. *Id.* at § 14.06(4).

Indeck and Ridgewood argue that the Appeals Court correctly concluded that they had established standing under the so-called "regulated industry" exception to the general rule that injury derived from business competition is not sufficient to confer standing. See *Massachusetts Ass'n of Indep. Ins. Agents & Brokers* v. *Commissioner of Ins.*, 373 Mass. 290, 293-294 (1977). The department, Greenville, and Boralex, on the other hand, argue that the Appeals Court's opinion departed in various ways from prior cases that have addressed the application of the area of concern test in the context of competitive injury. We turn to an examination of those cases.

The so-called "regulated industry" exception to the rule against standing for competitive harm was first denominated as such in the *Everett* case. The plaintiffs in that case were corporations operating taxicab companies that were in competition with other taxicab companies in the city of Everett. *Everett, supra* at 534. The plaintiffs sued some of their competitors, the city of Everett, members of the board of aldermen of Everett (one of whom was an officer of the corporations competing with the plaintiffs), and the chief of police of Everett and his wife (also

---

§ 14.08(4). Additionally, retail electricity suppliers can bank excess renewable energy credits for future compliance with the renewable energy portfolio standard. See *id.* at § 14.08(3).

officers of one of the competing corporations). *Id.* The plaintiffs alleged that the defendants violated G. L. c. 268A, the conflict of interest statute, in the award of licenses to the defendant corporations, and sought the revocation of those licenses. *Id.* at 534-535. On appeal, we held, first, that private parties could sue under G. L. c. 268A, § 21 (*a*), to set aside official acts substantially influenced by violation of the conflict of interest law[13] and, second, that the plaintiffs had standing to sue. *Id.* at 535, 538-539. After noting the general rule that business competition is not a sufficient injury for standing to sue, we stated: "This rule does not apply, however, to competitors in a regulated industry such as the one here who are attempting to challenge governmental action threatening their competitive position." *Id.* at 538. We reasoned further that one of the purposes of the conflict of interest statute was to "strike at corruption in public office [and the] inequality of treatment of citizens," thus protecting interests that included those asserted by the plaintiffs. *Id.* at 536, quoting Report of the Special Commission on Code of Ethics, 1962 House Doc. No. 3650, at 18. We went on to state that "the expressed goal of guarding against 'inequality of treatment of citizens' . . . indicate[s] that competitors of those receiving favored treatment ought to be within the class of persons protected and thereby have standing to sue under the statute." *Everett, supra* at 538-539. It was thus the circumstance that the plaintiffs' injury was within the area of concern of G. L. c. 268A, and not merely that the plaintiffs were competitors in a regulated industry, that ultimately led the court to conclude that the plaintiffs in *Everett* had standing to sue.

The three cases cited in *Everett* for the proposition that competitors in a regulated industry may have standing to challenge governmental action threatening their competitive position shed more light on the meaning of the "regulated industry" exception than does the *Everett* case itself. For example, in *South Shore Nat'l Bank* v. *Board of Bank Incorporation*, 351 Mass.

---

[13]General Laws c. 268A, § 21 (*a*), inserted by St. 1962, c. 779, § 1, then provided that: "In addition to any other remedies provided by law, any violation of section two, three, eight, or sections fifteen to twenty, inclusive, which has substantially influenced the action taken by any municipal agency in any particular matter shall be grounds for avoiding, rescinding or cancelling the action on such terms as the interest of the municipality and innocent third persons require."

363, 364-365, 367-368 (1966), we held that South Shore National Bank had standing to bring a declaratory judgment action challenging a decision by the Board of Bank Incorporation to permit a competitor to move its branch office to a location close to where South Shore proposed to open its own branch office. We reasoned that "South Shore is part of an industry in which competition is regulated and in view of the special circumstances indicated by the facts alleged . . . it is sufficiently 'aggrieved' to have standing to challenge the action which threatens its competitive position." *Id.* at 367. Importantly, we pointed out that when considering changes in branch office locations, "the board must take into account the effect such moves will have on competition between banks." *Id.* Thus, "a bank whose competitive position is endangered by the board's approval of a change in location of a branch of a competing bank has a sufficient interest in the board's action to bring this suit." *Id.* at 367-368.

Similarly, in *Bay State Harness Horse Racing & Breeding Ass'n* v. *State Racing Comm'n*, 342 Mass. 694, 695-696, 701-703 (1961), we held that a parimutuel harness racing licensee had standing to challenge the State Racing Commission's award of a license to a competitor. The applicable statute provided that no "licenses shall be issued for more than an aggregate of ninety racing days in any one year at the harness horse racing meetings combined." *Id.* at 696. The petitioner had requested a license to conduct parimutuel harness racing for sixty-seven days in 1961, but had only been granted a license for fifty-seven days. The license to its competitor permitted the competitor to conduct thirty-three days of such racing. *Id.* at 696-697. On appeal we held that the petitioner was a "person aggrieved" by the commission's decision granting the competitor a number of days that prevented the commission from granting the full number of days requested by the petitioner. *Id.* at 701-703, 705. We reasoned that "[w]e are dealing not merely with ordinary competitors, but with competitors which (in respect of the disputed ten days of harness racing) have mutually exclusive demands." *Id.* at 702. In such a situation, involving "mutually exclusive privileges or licenses," we deemed "the comparative appraisal of competitors [to be] essential" and concluded that the petitioner was entitled to judicial review. *Id.* at 702, 703.

Likewise, in *A. B. & C. Motor Transp. Co.* v. *Department of Pub. Utils.*, 327 Mass. 550, 550-552 (1951), we held that a carrier of property for hire could challenge a decision by the director of the agency that approved the transfer and assignment of three certificates of public convenience and necessity held by a competing carrier. We reasoned that "the granting or the transfer of a certificate of convenience and necessity to a carrier must be considered with reference, among other things, to the facilities already afforded by competing carriers and to the effect of further competition upon them and the public." *Id.* at 551. In other words, the plaintiff was an aggrieved party because "protect[ing] business from competition" was within the specific area of concern of the regulatory scheme at issue. *Id.*, quoting *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. 427, 429-430 (1949).

Two cases decided after the *Everett* case further help to map the contours of the "regulated industry" exception. In *Massachusetts Ass'n of Indep. Ins. Agents & Brokers* v. *Commissioner of Ins.*, 373 Mass. 290, 291, 296-298 (1977), we held that a trade association of insurance agents and brokers, and individual insurance agencies, had standing to bring a declaratory judgment action challenging a regulation promulgated by the Commissioner of Insurance. The regulation established rules and regulations for "group marketing plans" but not "mass merchandising plans." *Id.* at 291 & n.5. The plaintiffs alleged that the regulation violated the applicable statute, G. L. c. 175, § 193R, which required the commissioner to make rules and regulations regarding insurance issued pursuant to both "group marketing plans" and "mass merchandising plans." *Id.* at 291. The plaintiffs further alleged that the failure to promulgate rules and regulations with respect to the latter type of plans would result in unfair competition from insurers who offered those plans at lower rates than the group marketing plans that brokers and agents were permitted to offer. *Id.* In holding that the plaintiffs had standing to sue, we reasoned that the regulatory scheme governing the insurance industry "shows a clear public interest in the maintenance of a reasonable competitive level within the industry," and that this policy is expressed in the regulatory scheme's rate-setting provisions that declare as their purpose "regulating

insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory." *Id.* at 295. We reasoned further that "[i]t is clear that the Legislature was acting in what it believed was the public interest in defining goals of precluding unreasonable competition and discriminatory rates. . . . Thus if the plaintiffs in this case allege an economic or competitive injury which on its face implicates the effectuation of these important public policies then it can be said that the injury is within the statutory zone of concern." *Id.* Because we found "not only an allegation of loss but also a clear allegation that the plaintiffs might be subject to unfair competition which is arguably contrary to established legislative policy, the alleged injury is within the scope of the legislative concern." *Id.* at 296.

The second is *Massachusetts Ass'n of Cosmetology Schs., Inc. v. Board of Registration in Cosmetology*, 40 Mass. App. Ct. 706, 706-707, 709 (1996) (*MACS*), in which the Appeals Court held that an association of cosmetology schools lacked standing to challenge regulations adopted by the Board of Registration in Cosmetology. The regulations created licensing requirements for manicuring schools permitting them to exist independent of hairdressing schools; prior to this regulation, only hairdressing schools provided manicuring instruction. *Id.* at 706-707. In concluding that the plaintiff lacked standing, the Appeals Court reasoned that although the plaintiff's member schools were subject to detailed licensure and operating requirements, they were not part of a "regulated industry" because competition and pricing were not tightly controlled; that is, the purpose of the statute was not to control competition or pricing, but to ensure public safety. *Id.* at 708, 709, and cases cited.

As these cases demonstrate, the question of standing in the context of competitive injury turns not simply on *whether* an industry is regulated, but rather on *how* that industry is regulated. The common thread present in the cases in which standing has been found is regulatory schemes that contemplated some form of protection of the competitive interests of the respective plaintiffs. In contrast, in *MACS*, the plaintiff lacked standing because the regulatory scheme did not contemplate protection of those interests.

Essentially, the "regulated industry" exception is better under-

stood as an application of the traditional "area of concern" test in the specific context of competitive injury. See A. Cella, Administrative Law and Practice § 1857, at 432-433 (1986) ("Whenever the state governmental scheme of economic regulation evinces a public interest in maintaining a reasonable competitive level within the regulated industry, economic harm resulting from increased economic competition is deemed to be an injury within the area of concern of the statutory scheme"). Accordingly, if an industry is regulated in such a way that it can be said that the protection of competitors is within the regulatory scheme's area of concern, such a competitor alleging harm deriving from business competition would have standing to sue. Applying this principle to the present case leads us to conclude that Indeck and Ridgewood do not have standing to complain about the issuance of statements of qualification to their competitors.

General Laws c. 25A, § 11F, is plainly intended to increase the use of renewable energy by requiring retail electricity suppliers to provide an annually increasing minimum percentage of its sales to end-use customers from "new renewable generating sources." G. L. c. 25A, § 11F (*a*). As the department has stated, in its Policy Statement on the RPS Eligibility of Retooled Biomass Plants (Oct. 27, 2005), the "clear intent of [G. L. c. 25A, § 11F], is to stimulate development of 'new' renewable energy generating sources." Although the department controls which generation facilities receive statements of qualification, in performing this responsibility the department is situated much like other licensing agencies applying eligibility requirements. If the department determines that a generation facility meets the eligibility criteria, it will issue a statement of qualification allowing that facility to participate in the program. See 225 Code Mass. Regs. § 14.06(1). Nothing in G. L. c. 25A, § 11F, or in the department's regulations requires the department to consider the potential effect on existing competitors of granting a statement of qualification to a new competitor. And nothing therein limits or suggests a limitation on the number of entrants into the market. Further, while it is true that an owner or operator that receives a statement of qualification must report changes in eligibility status, see 225 Code Mass. Regs. § 14.06(3), and the department may suspend or revoke a statement of qualification for failure to comply with the applicable regulations, see *id.* at § 14.06(4), these provi-

sions simply reflect the department's ongoing licensing function, and not an intent to control competition. See *MACS, supra* at 709 (detailed licensure and operating requirements did not create "regulated industry" where competition and pricing not tightly controlled).

In sum, we are persuaded that in enacting G. L. c. 25A, § 11F, the Legislature intended to induce the promotion and expansion of the renewable energy generating market, and did not seek to protect and thereby confer standing to sue on existing competitors, thereby *creating* a barrier to market entry.[14] If existing competitors were allowed to challenge another company's application to enter the renewable energy market, it would hinder competition, delay much needed renewable energy projects, and create a disincentive for developers and their investors to construct new generation facilities. In other words, granting the plaintiffs standing in this case would "subvert the very purpose of the [over-all] statutory scheme." *School Comm. of Hudson* v. *Board of Educ.*, 448 Mass. 565, 584 (2007).[15]

*Judgment affirmed.*

---

[14]Another example of this purpose with regard to renewable energy appears in the statutory provision establishing the Massachusetts Renewable Energy Trust Fund (fund) under the auspices of the Massachusetts Technology Park Corporation (corporation). G. L. c. 40J, § 4E, inserted by St. 1997, c. 164, § 68. The corporation is authorized to draw on money from the fund for certain public purposes, including "the development and increased use and affordability of renewable energy resources in the commonwealth and the New England region," "the delivery to all consumers of the commonwealth of as many benefits as possible created as a result of increased fuel and supply diversity," and "the growth of the renewable energy-provider industry." *Id.* The corporation is directed to adopt a detailed plan "that ensures that the fund shall be employed to provide financial and non-financial resources to *overcome* barriers facing renewable energy enterprises, institutions, and projects" (emphasis added). *Id.*

[15]While we conclude that the plaintiffs do not have standing to sue the department in this case, we do not mean to foreclose the possibility that a renewable energy generator participating in the renewable energy portfolio standard program might have standing to sue if the department repeatedly flouted its statutory commands, its own regulations, or some other legal requirement. See St. 1997, c. 164, § 1 (*l*) ("primary elements of a more competitive electricity market will [include] . . . full and fair competition in generation"). See also G. L. c. 231A, § 2 (providing for declaratory judgment with respect to legality of State agency's practices or procedures alleged to have violated law where violation "consistently repeated").