Kaplan, Mitchell H., J.
INTRODUCTION
This case arises out of a dispute concerning the defendant, the Commissioner of Banks’ (the Commissioner), decision to approve the defendant, The Boston Firefighters Credit Union’s (BF Credit), application to amend its by-laws to expand its field of membership to include Boston Police, Massachusetts State Police, and Suffolk County Sheriffs Department employees (collectively, police officers). The plaintiff, City of Boston Credit Union (CB Credit), alleges that the Commissioner’s decision exceeded “his authority and was an abuse of discretion, arbitrary and capricious, unsupported by substantial evidence; and unlawful under G.L.c. 171.” In its Complaint, CB Credit claims a right of review of that decision in the nature of certiorari under G.L.c. 249, §4 and also seeks declaratory and injunctive relief under G.L.c. 231A. The case is before the court on CB Credit’s motion for a preliminary injunction and the defendants’ motion to dismiss the complaint for lack of standing under Mass.R.Civ.P. 12(b)(1) and for failure to state a claim under Mass.R.Civ.P. 12(b)(6). At oral argument on these motions, both parties agreed that the materials submitted in support and opposition to these motions included all relevant documents necessary to resolve all issues raised by the Complaint. After consideration of the parties’ excellent memoranda of law, the arguments advanced at the hearing, and the materials submitted, for the reasons that follow, CB Credit’s motion is DENIED and the defendants’ motion is ALLOWED. A final judgment shall issue dismissing the Complaint.
BACKGROUND
CB Credit and BF Credit are both state-chartered credit unions. CB Credit was established in 1915 and BF credit in 1948. State-chartered credit unions are organized under and governed by G.L.c. 171. The by-laws of the credit union determine the condition of residence, occupation, or association which qualify persons for membership. See G.L.c. 171, §9.Thegroup of persons eligible for membership is generally referred to as a credit union’s “field of membership” or “field of operation.” See, e.g., G.L.c. 171, §6. While CB Credit’s field of membership was originally limited to employees of the City of Boston, in 2007 the Commissioner approved an amendment to its by-laws such that it then included any person who either lived or worked in Suffolk or Norfolk Counties, and members of that person’s family. A substantial number of Boston police officers and Suffolk County Sheriffs department employees are members of CB Credit: together they account for 17.4% of its total deposits and 28.8% of its aggregate loan balances.
Prior to the events giving rise to this litigation, BF Credit’s field of membership included Boston firefighters as well as other members of the Professional Fire Fighters of Massachusetts and their families. BF Credit received approval of its board and members to seek the Commissioner’s approval to expand its membership to include police officers. It submitted its application to the Commissioner for approval of its proposed by-law amendment adding this group on May 14, 2014.
G.L.c. 171 provides very little specific guidance to the Commissioner concerning the process that he *497 should employ in deciding whether to permit a credit union to begin transacting business or to expand its field of operation. §3 provides that: credit unions shall be organized “after such notice and hearing, if any, as the commissioner may require”; and “[i]n determining whether the public convenience and advantage will be promoted by the establishment of such credit union, the commissioner shall consider the proposed field of operation and the standing of the proposed incorpo-rators.” §6 then directs:
If it appears that all requirements of law have been complied with, that the credit union will have its shares and deposits insured by a federal agency and that the qualifications of the personnel are satisfactory, the commissioner, shall, if satisfied that the proposed field of operation is favorable to the success of such corporation and that the standing of the proposed incorporators is such as to give assurance that its affairs will be administered in accordance with the spirit of this chapter, issue a certificate authorizing such corporation to being the transaction of business.
G.L.c. 171, §10 includes no apparent limitations on the Commissioner’s discretion to approve by-law amendments that expand fields of membership. It states only that: “No amendment or amendments containing a change in the conditions of residence, occupation or association which qualify persons for membership . . . shall become operative until approved in writing by the commissioner.”
The Commissioner has, however, adopted a process for considering and approving expansion of membership that appears to have been in place for many years and employed by many commissioners. BF Credit has directed the court to a September 23, 1992 “Decision Relative to the Application of Pittsfield G.E. Employees’ Credit Union, Pittsfield, Massachusetts to Amend its By-Laws Governing the Associations which Qualify Persons for Membership.” There, the Commissioner reflected on the notice, comment period and public hearing that had been conducted in connection with the petitioner’s application. He then went on to identify the standards that he used in considering the application:
Although not tied to the single test of common bond, the Division does have standards for review of petitions to expand a credit union’s membership. In recent years those standards have been indicated by the information required in the application as well as the review process for such petitions. In many ways the standards are similar to those used to review most applications submitted by banks and credit unions.
The standards for general applicability include the financial and managerial resources of the applicant: the convenience and needs of the community to be served; competition among financial institutions; the applicant’s compliance with provisions of the Community Reinvestment Act and other statutory requirements specific to the transaction. The analysis of those factors are considered in the light of the application pending before the Division. In the case of an application to amend a credit union’s by-laws relative to membership, the Division considers the reasons the specific amendment is being sought; the clarity of the terminology used in the amendment; existing relationships or contacts with individuals or entities to be affected by the proposed change; the scope of the proposed change in the number of members as well as anticipated changes to the credit union’s facilities, services, assets and expenses resulting from the implementation of the proposed amendment.
In a subsequent request made a few years later by the same credit union to again expand its field of operation, the Commissioner explained the extent to which he takes the potential for competition between or among the applicant and existing credit unions or other financial institutions into consideration when acting upon an application.
The impact on competition among financial institutions, including both banks and credit unions resulting from an approval of this by-law amendment was the subject of extensive scrutiny by the Division. It is the longstanding position of the Division not to take action to protect market shares of competing institutions. Healthy competition is best achieved where a variety of financial institutions compete head to head in delivering high quality and low cost deposit and credit services to consumers and businesses . . . However, in the view of the Division the by-law amendment in and of itself will not directly and negatively impact other financial institutions. Adverse effects, if any, will result from consumer choice of all the banking alternatives which currently exist in the market.
February 25, 1994, “Decision Relative to the Application of Pittsfield G.E. Employees’ Credit Union, Pitts-field, Massachusetts to Amend its By-Laws To Change Both the Name of the Credit Union and the Associations which Qualify Persons for Membership.”
Consistent with these decisions issued in the 1990s, the current form of application for approval of a by-law amendment expanding the field of membership requires the applicant to provide information appropriate for consideration of the factors described above. Of import to the pending case, item 6 of the application requires that the credit union: “List all other state or federally-chartered unions for which any identified party to be affected by the proposed amendment may presently be eligible.” Among the credit unions that BF Credit listed in response to this item was CB Credit.
CB Credit received notice of BF Credit’s application and wrote to the Commissioner to express its “strong objection” to it. In its objection CB Credit, among other *498 things, argued that BF Credit’s “proposal could cause substantial harm to [it] because two of the three employee groups that [BF Credit] seeks to bring within its field of Membership are key components of [CB Credit’s] membership base . . . Losing more than 25% of this member base would put [its] earnings in a negative position.”
In his November 25, 2014 decision approving BF Credit’s by-law amendment, the Commissioner addressed CB Credit’s position in the following manner:
Also considered in the review of the application were comments received from another state-chartered credit union (Commenter), and responses from the Credit Union and Commenter, as requested by the Division. In addition, separate meetings were held at the Division with the Credit Union and the Commenter to address the issues put forward. The primary issue raised by the Commenter was that the Credit Union’s proposed expansion represents an important and profitable segment of the Commenter’s current field of membership. The Commenter believes that its profitability would be adversely affected if the proposed expansion were allowed.
While the Division has reservations about one credit union specifically targeting another credit union’s field of membership, the Division is a strong proponent of open competition among all credit unions and other financial institutions. The Division believes that ultimately it is up to the consumer to determine which financial institution he or she wishes to use.
CB Credit alleges that in “rendering the Decision, the Commissioner failed to consider the factors required under the Division’s own policies and under G.L.c. 171, including ’’the impact on [CB Credit’s] ability to successfully serve its membership field and to operate on a safe and sound basis." According to CB Credit, no evidence contradicting its representations concerning the effect that the loss of members to BF Credit would have on CB Credit’s “profitability, safety and soundness” was submitted by BF Credit and therefore the “Commissioner’s Decision to grant [BF Credit’s] Application for an expanded field of membership is an abuse of discretion, arbitrary and capricious, unsupported by substantial evidence, and was based on errors of law.”
DISCUSSION
Certiorari Review
G.L.c. 249, §4 establishes that “[a] civil action in the nature of certiorari to correct errors in proceeding which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal, may be brought in the supreme judicial or superior court . . .” “Certiorari is a limited procedure reserved for correction of substantial errors of law apparent on the record created before a judicial or quasi-judicial tribunal.” School Committee of Hudson v. Board of Education, 448 Mass. 565, 575-76 (2007). “If the proceeding or hearing involves unsworn statements by interested persons advocating or disapproving the proposed new policy rather than sworn testimony by witnesses subject to cross-examination in a hearing preceded by specific charges, the hearing is more likely to be legislative or regulatory, rather than quasi-judicial, in nature. Further, if a hearing is not preceded by specific charges and is not followed by the adoption of formal findings of fact, it is more likely regulatory in nature.” (Internal citations and quotations omitted.) Id.
In this case, the Commissioner’s decision approving the by-law amendment is the paradigm of regulatory action. Notice of BF Credit’s application was provided to CB Credit who was given the opportunity to comment upon it. There is no statutory requirement for a hearing and the Commissioner need not make findings of fact. Moreover, not only was there no sworn testimony provided or opportunity for cross examination, the Commissioner met separately with both CB Credit and BF Credit to better understand CB Credit’s concerns and BF Credit’s responses before rendering his decision. See South Shore National Bank v. Board of Bank Incorporation, 351 Mass. 363, 365-66 (1966) (where certiorari review of a decision by the Board of Bank Incorporation approving an application to move a branch office of a bank was denied because this was an administrative not quasi-judicial decision). CB Credit cannot seek certiorari review of the Commissioner’s decision to permit BF Credit to amend its by-laws and this count therefore fails to state a claim.
Declaratoiy Relief
The defendants have moved to dismiss the count seeking declaratory and injunctive relief under G.L.c. 231A both under Mass.R.Civ.P. 12(b)(1) asserting that CB Credit lacks standing to challenge the Commissioner’s administrative action and under Rule 12(b)(6) for failure to state a claim entitling it to relief. The court will consider each ground.
Standing
‘To establish standing to challenge administrative agency actions, a plaintiff must allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred . . . Normally, an injury derived from business competition is not sufficient to confer standing . . . [T]his rule does not apply to competitors in a regulated industry . . . who are attempting to challenge governmental action threatening their competitive position ... In such circumstances, not only must the particular statute under which the violation is alleged to have occurred be examined in order to see whether the alleged injury is within the parameters of the statutory concern but . . . [the court] must ascertain whether the type of injury alleged is inconsistent with the aims and purposes of the entire regulatory scheme.” (Internal cita *499 tions and quotations omitted.) Indeck Maine Energy, LLC v. Commissioner of Energy Resources, 454 Mass. 511, 517 (2009). The standing issue raised by Indeck necessitated the analysis of a statute that required retail electricity suppliers to provide an annually increasing minimum percentage of its sales from new, renewable generating sources. In order for a renewable energy generation facility to participate in the program the Commissioner of Energy Resources had to grant it a “statement of qualification.” The plaintiff had received a statement of qualification and made substantial capital investments to provide renewable energy pursuant to the program. It sought to challenge the Commissioner’s issuance of such statements to two new market entrants.
The Supreme Judicial Court (SJC) began its consideration of plaintiffs standing to challenge the Commissioner’s decision to grant additional statements of qualification by carefully reviewing several of its prior decisions in which the SJC had addressed the question of when a firm that participates in a regulated industry has standing to challenge administrative decisions of the.agency that regulates that industry that are not specifically directed at the plaintiff firm. It summarized its analysis of the question as follows:
As these cases demonstrate, the question of standing in the context of competitive injury turns not simply on whether an industry is regulated, but rather on how the industry is regulated. The common thread present in the cases in which standing has been found is regulatory schemes that contemplated some form of protection of the competitive interests of the respective plaintiffs ... Accordingly, if an industry is regulated in such a way that it can be said that the protection of competitors is within the regulatory scheme’s area of concern, such a competitor alleging harm deriving from business competition would have standing to sue.
Id. at 524-25. Applying these principles to the case before it, the SJC held that:
Although the department controls which generation facilities receive statements of qualification, in performing this responsibility the department is situated much like other licensing agencies applying eligibility requirements. If the department determines that a generation facility meets the eligibility criteria, it will issue a statement of qualification allowing that facility to participate in the program . . . Nothing in [the statute], or in the department’s regulations requires the department to consider the potential effect on existing competitors of granting a statement of qualification to a new competitor. And nothing therein limits or suggests a limitation on the number of entrants into the market.
Turning to the case before this court, a careful analysis of Chapter 171 suggests that the statutory scheme was not designed to protect credit unions from new market entrants and to preserve their existing market share. As noted above, §10, which requires prior approval of by-law amendments that contain a change in the field of membership, provides no instruction to the Commissioner concerning the factors he should consider when ruling on an application. §9 sets out the charter provisions that must be covered by the by-laws but does not inform this question. Looking to the sections of the statute that address the establishment of new credit unions, §3 directs that an application for a proposed credit union be accompanied by an investigation fee, and, “[i]n determining whether the public convenience and advantage will be promoted by the establishment of such credit union, the commissioner shall consider the proposed field of operation and the standing of the proposed incorpo-rators.” §6, however, as noted above, clearly directs the commissioner to issue a certificate authorizing a new credit union to transact business if the commissioner is satisfied that the deposits will be insured by a federal agency, the qualifications of the personnel who will administer and govern the credit union are satisfactory and “the proposed field of operation is favorable to the success of such corporation.” In other words, the Commissioner is generally to focus on the question of whether he finds that the applicant will be financially sound and successful. Obviously, in making his decision the Commissioner may consider whether a particular field is likely to generate enough members to enable the new applicant to succeed in its mission, and the number of credit unions or other types of financial institutions already servicing these members may be a relevant consideration, but there is no mandate in the statute directing the Commissioner to protect the existing market share of other credit unions.
Clearly, the Commissioner is the administrator to whom the task of approving new credit unions or by-law amendments expanding the field of membership of existing credit unions has been assigned by the Legislature. Chapter 171 provides very little limitation on the manner in which he is to reach sound decisions. The prior decisions of the Commissioner to which the court has been directed demonstrate a consistent position favoring competition between financial institutions and choice for consumers. “So long as the agency’s interpretation of its regulations and statutory mandate is rational, and adhered to consistently, it should be respected.” Boston Police Superior Officers Fed’n v. Boston, 414 Mass. 458, 462 (1993).
Much like the licensing issue addressed in Indeck, the court finds that in this case the Commissioner appropriately considered whether BF Credit’s application to expand its field of membership was sound and approved the by-law amendment. Chapter 171, as consistently interpreted by the Commissioner, is not intended to regulate competition but rather to make sure that only qualified applicants are authorized to *500 establish credit unions or expand their membership.[1] Accordingly, CB Credit does not have standing to challenge the Commissioner’s decision to approve a by-law amendment requested by another credit union, even if the applicant may then be in a position to compete with CB Credit for members.[2]
Statement of a Claim on which the Court May Act
Even if CB Credit had standing to pursue a claim for declaratory relief, its complaint does not present a claim under G.L.c. 231A, §2 on which this court could enter judgment. In First National Bank of Cape Cod v. Board of Bank Incorporation, 361 Mass. 381, 383 (1972), another case involving the branch banking statute, see n.2, supra, the SJC held that where the Commissioner’s discretionary decision to permit a branch office to open was not adjudicatory and subject to review under G.L.c. 30A or by writ of certiorari, “(w]e decline to hold that G.L.c. 231A confers jurisdiction on the court to review the board’s action.” It may be that this holding is enough to dispose of the present case as well. Moreover, even a brief review of Chapter 171 confirms the essential inability of the court to review the Commissioner’s discretionary act in this case.
The declaratory judgment procedure described in chapter 231A “section one may be used in the superior court to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any . . . state agency or official which practices or procedures are alleged to be in violation of the Constitution of the United States or of the constitution or laws of the Commonwealth, or are in violation of rules or regulations promulgated under the authority of such laws, which violation has been consistently repeated . . .” In this case, CB Credit does not point the court to any regulation applicable to the Commissioner’s decision to approve BF Credit’s application for a by-law amendment expanding its field of membership, and no Constitutional rights are implicated, so the only possible basis for the issuance of declaratoiy relief would be that his decision violated a state law. However, as noted above, chapter 171 pro-' vides little direction to the Commissioner in deciding when to approve, or reject, a new application for a credit union or an application to expand a field of membership. In particular, the statute says nothing whatever about what weight, if any, the Commissioner should give the potential effect of a new market entrant on the market share of an existing credit union. It is apparent from the decision in this case, and the Commissioner’s decisions in other similar matters to which the parties have drawn the court’s attention, that the Commissioner has given consideration to the competitive position of other financial institutions, but ultimately concluded that: “Adverse effects, if any, will result from consumer choice of all the banking alternatives which currently exist in the market.” And in particular with respect to the parties to this case: “The Division believes that ultimately it is up to the consumer to determine which financial institution he or she wishes to use.” CB Credit’s assertion that the Commissioner’s exercise of discretion in this manner, generally, or as applied to CB Credit in this case, violates'a statutory mandate finds no support in chapter 171. Rather, it is an invitation for this court to substitute its judgment for that of the Commissioner in deciding what factors should be most important in considering an application for a license or by-law amendment. This court is not empowered to engage in such a review. Compare South Shore, supra, at n.2 (where the question presented was purely one of statutory interpretation); Mass. Assoc. of Ind. Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290 (1977) (where the plaintiff asserted that a regulation promulgated by the Commissioner of Insurance was invalid because it was inconsistent with express provisions of the enabling statute); and Bay State Harness Horse Racing & Breeding, 342 Mass. at 699 (where the SJC found that the agency decision was adjudicatory and therefore required specific findings of fact subject to review under G.L.c. 30A, §14).
ORDER
For the foregoing reasons the plaintiffs motion for a preliminary injunction is DENIED, and the defendants’ motion to dismiss is ALLOWED. Final judgment shall enter dismissing the complaint.

 Compare Bay State Harness Horse Racing & Breeding Ass’n v. State Racing Comm’n, 342 Mass. 694 (1961), where two firms each sought a mutually exclusive right to a finite resource — racing days. Here a person can be a member of multiple credit unions, e.g., CB Credit and BF Credit, if he or she is both a resident of Suffolk or Norfolk counties and a fireman or a police officer.

CB Credit argues that South Shore National Bank v. Board of Incorporation, 351 Mass. 363 (1966), supports its position that Chapter 171 is intended to regulate competition. That case involved a statute, since repealed (G.L. 172, §ll(a), as appearing in St. 1961, c. 493, §1), that dealt, among other things, with the permissible location of new branch offices of state chartered banks and required the Commissioner to take into account the effect that placement of a branch office would have on the competitive position of an existing bank, even a national bank such as South Shore. In that case, South Shore alleged that its application to the Federal Comptroller of the Currency for permission to open a branch near the same location as that approved by the Commissioner for Rockland Tmst had been adversely affected by the Commissioner’s decision. Notably, South Shore’s contention was that the statute in question prohibited the Commissioner from approving a Rockland Trust branch at that location; not because the Commissioner did not consider the effect on the competitive position of other banks, but because the statute in question did not permit Rockland Trust to open a branch there under any circumstances. The case involved a question of statutory interpretation — no facts were in dispute. See 40 Mass. Prac. Series §1760, The Political Question Doctrine, and the Branch Banking Cases, n. 36, for a discussion of cases in which the SJC appeared more willing to find standing when the matter involved interpretation of statutes or regulations and no discretionaiy agency acts were implicated or facts in dispute.